374 P.2d 648

Pauline BOLT, Plaintiff-Appellant,

v.

Aubrey DAVIS, Administrator of the Estate of Jack Roddy, Deceased, Defendant-Appellant,

Transcontinental Bus System, Inc., a corporation; American Linen Supply of New Mexico, Inc. (N. S. L.), a corporation; Casper U. Lutz and Robert K. Risner, d/b/a Las Cruces Laundry & Dry Cleaning; and Colonial Service of New Mexico, a corporation, Defendants-Appellees.

No. 6887.

Supreme Court of New Mexico.

June 25, 1962.

Rehearing Denied Oct. 9, 1962.

Adams & Calkins, Albuquerque, for appellant.

Rodey, Dickason, Sloan, Akin & Robb, Albuquerque, J. R. Nelson, Truth or Consequences, for appellee, Transcontinental Bus System, Inc.

E. Forrest Sanders, William W. Bivins, Las Cruces, for appellee, Aubrey Davis, Administrator.

LaFel E. Oman, Garnett R. Burks, Jr., J. Benson Newell, Las Cruces, for appellees, American Linen Supply of New Mexico, and Colonial Service of New Mexico.

CHAVEZ, Justice.

Plaintiff-Appellant, Pauline Bolt, filed suit against defendants-appellees, Transcontinental Bus System, Inc., a corporation, hereinafter referred to as "Transcontinental"; Aubrey Davis, Administrator of the Estate of Jack Roddy, Deceased, hereinafter referred to as the "Roddy Estate"; American Linen Supply of New Mexico, Inc., (N.S.L.), a corporation, hereinafter referred to as "American Linen"; and Colonial Service of New Mexico, a corporation, hereinafter referred to as "Colonial."

The complaint is in two counts. The first count alleged that on March 20, 1959, appellant was riding in an automobile driven by the deceased, Jack Roddy, on U. S. Highway 85 near Hatch, New Mexico; that Transcontinental, through its agent and driver, was operating one of its passenger motor buses on said highway; that at said time and place the decedent, Roddy, and Transcontinental were operating their respective vehicles in a careless and negligent manner, and that their joint and concurrent negligence caused the vehicles operated by them to collide; that at the time and place of the accident the deceased, Roddy, was an employee or agent of American Linen and Colonial, or one or more of them, and at the time of the accident was acting within the scope of his employment; that appellant was accompanying the decedent, Roddy, for his benefit and the benefit of his said employers, but that appellant had no control over the operation of said vehicle; that as a direct and proximate result of the joint and concurrent negligence of Transcontinental and the deceased, Roddy, and each of them, the appellant received serious bodily injuries which resulted in the amputation of both legs above the knees, pain and suffering, permanent disability, loss of earnings, and the impairment of her earning capacity.

Appellant's second count was filed as an alternative to count one and was directed against Transcontinental. Under this count the complaint generally alleged and prayed for a recovery on the theory of last clear chance.

Transcontinental answered denying any negligence on its part, although admitting that the motor vehicle operated by the deceased, Roddy, was being operated in a negligent manner; admitted that an accident occurred between the Roddy vehicle and the bus of Transcontinental, and that appellant was thrown from the Roddy vehicle and suffered the amputation of both legs above the knees. By affirmative defense, Transcontinental alleged that appellant's complaint failed to state a claim upon which relief could be granted, and raised the defenses of joint venture, sudden emergency, contributory negligence and unavoidable accident. Transcontinental denied the allegations of count two of appellant's complaint, except that it admitted that the accident occurred near the northerly approach of a bridge located at or near the accident scene. In answer to the crossclaim of the Roddy Estate, Transcontinental admitted that a collision occurred between its motor bus and the crossclaimant's vehicle, but denied any negligence on its part. Transcontinental also affirmatively pleaded the defenses of contributory negligence, joint venture, assumption of risk and unavoidable accident.

Colonial answered admitting that an accident had occurred between a vehicle in which appellant was riding and Transcontinental's bus, and admitted that it was engaged in the laundry business in Las Cruces, but otherwise generally denied the other allegations of said complaint. In addition, Colonial alleged that appellant's complaint failed to state a claim upon which relief could be granted, and affirmatively alleged the separate defenses of contributory negligence, unavoidable accident and assumption of risk.

American Linen answered alleging the identical defenses raised by Colonial, except that it alleged it is engaged in the business of renting linens and is not in the laundry and dry cleaning business.

The Roddy Estate filed an answer specifically denying negligence on the part of the deceased, Roddy; admitted that the accident occurred between the bus of Transcontinental and Roddy's vehicle; affirmatively alleged that appellant's amended complaint failed to state a claim upon which relief could be granted; alleged that appellant was a guest in Roddy's vehicle; and also raised the defenses of contributory negligence, unavoidable accident, joint enterprise and assumption of risk. The Roddy Estate also filed a crossclaim against Transcontinental, alleging negligence which resulted in the serious injury and death of Roddy. A second cause of action in the crossclaim alleged and prayed for a re-

covery under the doctrine of last clear chance. A second cause of action in the second crossclaim made a demand for damages to the 1955 Cadillac owned by the deceased, Roddy.

The case came on for trial before a jury in Sierra County, New Mexico, and at the conclusion of appellant's case, all of the appellees moved for a directed verdict.

Transcontinental, by separate motions, moved for a directed verdict as to the issues raised between appellant and Transcontinental, and as to the issues raised by the crossclaim against Transcontinental by the Roddy Estate on the ground, among others, that there was no substantial evidence of negligence on its part, and that there was no substantial evidence that any action of Transcontinental was a proximate cause of the alleged collision.

The Roddy Estate moved for a directed verdict on the ground, among others, that there was no competent evidence of negligence against the decedent, Roddy.

American Linen moved for a directed verdict on the ground that appellant had failed to prove by competent evidence that decedent, Roddy, at the time and place of the accident, was an employee or agent of American Linen, acting within the scope of his employment; that the evidence shows affirmatively that the said Jack Roddy was never, and particularly at the time and place of the accident, an employee or agent of American Linen; that there was no evidence that Roddy was subject to any order or control of American Linen, or that American Linen had the right to control or to discharge Roddy for disobedience or misconduct.

Colonial moved for a directed verdict on the ground that appellant had failed to prove by competent evidence that Roddy was, at the time and place of the accident, an employee or agent of Colonial, acting within the scope of his employment.

The trial court sustained the motions made by Transcontinental as to the claim of appellant and as to the crossclaim of the Roddy Estate. It also sustained the motions on behalf of American Linen and Colonial, but denied the motion on behalf of the Roddy Estate. Judgments were entered in conformity with the trial court's rulings, and an appeal was taken from the several judgments.

When the trial of the cause was resumed, after the trial court had sustained the motions for directed verdict as hereinbefore set out, appellant moved to dismiss, without prejudice, her cause of action against the Roddy Estate and this motion was granted.

The first question for decision is whether there is substantial evidence in the record that Transcontinental was negligent and that such negligence was the proximate cause of the accident.

The accident occurred about 2:00 o'clock on the early morning of March 20, 1959, when Roddy's Cadillac automobile in which appellant was riding collided with a bus of Transcontinental near a bridge just north of Hatch, New Mexico. On the night of March 19, 1959, at about 9:00 p. m., appellant saw Jack Roddy at the American Legion Bar in Hatch, where she had gone for a sandwich. Roddy was there when she went in and was behind the bar putting up linen. After Roddy finished putting up linens he came from behind the bar and started talking to appellant. They played a bowling machine for awhile and about 10:30 p. m. left the American Legion Bar in Roddy's car and went to the Blue Moon Bar in Salem, which is located about five miles north of Hatch on U. S. Highway 85. Appellant's purpose in making this trip with Roddy was to introduce him to Mannie Valles, the owner of the Blue Moon Bar, and try to get the linen service there at the bar. Although appellant and Roddy both drank beer during the evening, neither of them became drunk. About 2:00 a. m. appellant and Roddy left the Blue Moon Bar in Roddy's car and proceeded in a southerly direction toward Hatch on U. S. Highway 85 with Roddy driving. Appellant was sitting in the front seat to the right of Roddy. Roddy drove at a normal rate of speed of between 35 and 40 m. p. h. As they approached the bridge where the accident occurred, appellant reached down in her purse and was looking for cigarettes and matches in the darkness. At this time Roddy was driving on the right-hand side of the highway, but during the time appellant was looking for her cigarettes and matches she did not know where he was driving on the highway. While fumbling in her purse, she looked up and saw "blinding lights." In the accident which followed, appellant suffered numerous injuries, including the mangling of her legs which were later amputated.

The speed limit at the scene of the accident was 55 m.p.h. Transcontinental's bus, going in a northerly direction, approached the bridge at a speed of 35 m.p.h. and at the point of impact its speed was 10 m.p.h. In the approach to the bridge, there is a rise or slight upgrade in the highway on both sides of the bridge. The exact upgrade is not shown by the evidence, although it can be seen in the exhibits introduced into evidence. There is evidence that a driver could not see approaching cars until within a distance of from 200' to 400', although the glare of headlights of approaching cars could be seen. The bridge, as shown by the evidence and exhibits, is 19' wide and 159' long, with a rail on both sides. The railings are approximately 3' high and consist of a guardrail at the bottom and a timber board rail above it. There is no cover or top on the bridge. The Transcontinental bus involved in the accident is 8' wide and 35' long. The highway on both sides of the bridge,

for some distance and at the point of impact, is straight.

The evidence shows that the Cadillac car driven by Roddy and in which appellant was riding, approached the bridge going south at a terrific rate of speed. The witness, Lillian F. McNulty, so testified and also stated that as the Cadillac was coming toward the bus it was "weaving" and made a large "S" curve, commencing on the east side of the road, then returning to the west side, and finally ending up in front of the bus in the bus' lane of traffic, where it was the last time she saw it just before the collision. The bus and car collided at the north end of the bridge. The witness, McNulty, did not notice the application of brakes on the bus just before the collision occurred, but stated that it was slowing down "as though you release your foot off the gas pedal." She also testified that the bus at all times was on its own lane of traffic, with the right side of the bus as close to the easterly railing of the bridge as possible, and that the bus came to a stop after the accident within a couple of bus lengths "as soon as possible" and ended up on the east shoulder of the highway. Mrs. McNulty assumed that the bus had on its regular driving lights, but she was watching the headlights of the approaching car. After getting out of the bus at the scene of the accident, Mrs. McNulty noticed a lady lying at the rear of the bus with her legs in the path of the bus' wheels. Mrs. McNulty testified that at the time of the accident Mrs. Roblez appeared to be asleep.

Mrs. Desidera S. Roblez was a passenger on the Transcontinental bus going from El Paso, Texas, en route to Bingham, Utah. The bus left El Paso at 12:00 o'clock midnight. There were two other ladies on the bus and Mrs. Roblez sat on the left side of the bus about two seats behind the bus driver. Mrs. Roblez was asked the following questions:

"Q As you left Hatch and going toward the bridge where the accident occurred that night, did the driver of this bus, at any time, change the beam of the headlights on the bus?

"A No, he didn't touch anything." Mrs. Roblez testified that she saw the headlights of the car that later collided with the bus. The car at that time was a block or a block and a half away, coming from the north. Mrs. Roblez was also asked the following questions and made answers thereto:

"Q Did you observe the collision between the bus and the automobile?

"A I didn't see him but I feel.

"Q You felt it. How did you feel it? Describe that feeling.

"A I saw the car and I noticed the bus gave him the chance to go by—I just heard the noise.

\*     \*     \*     \*     \*     \*

"Q Mrs. Roblez, before you felt this collision, did you feel the bus slowing down or being braked?

"A He was coming the same.

"Q Did you or did you not feel the application of brakes on the bus before this collision?

"A No, he didn't put nothing."

On cross-examination by counsel for the Roddy Estate, Mrs. Roblez testified as follows:

"Q Did the driver of the bus, just prior to the collision, ever steer the bus from the path it was then traveling either to the right or to the left on the highway?

"A No, he didn't do nothing; he just get closer to the car and that is why he hit it.

"Q Did I understand you to say that the bus got closer to the car, state whether or not the car was still in its own lane of travel where you first saw it?

"A Yes, he was coming perfect."

The witness A. O. Pipkin testified that he was qualified as an expert in the investigation of accidents and reconstructed them from the physical evidence, examining skid-marks and determining stopping distances. He had seen the bus in question. It was about 8′ wide and approximately 35′ long. The driver of the bus would sit about 8′ above the road level. Mr. Pipkin was at the scene of the accident on or about May 20, 1960, and took photographs which were introduced into evidence. The witness Pipkin made tests as to the stopping distances of a bus similar to the bus involved in the accident. These tests were made upon a surface similar to the surface of the road at the scene of the accident. The bus involved in the accident had air brakes and they were working properly. Based upon his experience and training, and taking into consideration the tests he had made, Pipkin testified that, under conditions that existed the night of the accident, when going 10 m.p.h., after the wheels had been locked and the brakes fully applied, the bus should have been able to stop in a distance of no greater than 12′.

On cross-examination Mr. Pipkin testified that when he said that at 10 m.p.h., with the wheels of the bus locked, it should stop in no more than 12′, that he did not compute the reaction time or the initial braking lag, both of which would have to be added to the skidding distance in order to determine the overall stopping distance of the bus from the time danger was first noted until it came to a halt.

With regard to the stopping distance of the bus, Pipkin's testimony reveals the following: ·

| m.p.h. | Sliding Distance | Total Stopping Distance Including Reaction Time |
|---|---|---|
| 25 | 50' | 98' |
| 30 | 75' | 135' |
| 35 | 100' | 165' |
| 50 | 210' | 295' |

In arriving at his estimate of stopping distances of the bus at 10 m.p.h., the witness Pipkin made three tests, as follows:

The average sliding distance of the three tests was 9.1'. The shadow area is the distance traveled "while the brakes are being applied and the wheels are still turning." The figure of "not over 12 feet" for stopping distance of the bus at 10 m.p.h. was based on the assumption that all wheels were on dirt and gravel, which would be a longer distance than if the bus were partially on pavement and partially on gravel.

| Test | Total Stopping Distance | Shadow Area | Actual Sliding Distance |
|---|---|---|---|
| First | 22.5' | 14.2' | 8.3' |
| Second | 21.9' | 13.7' | 8.2' |
| Third | 24.7' | 13.7' | 11' |

The "sliding distance" referred to by Mr. Pipkin was defined by him to be that distance traveled after the brakes are fully applied, in other words, after the initial reaction and brake lag time.

Appellant testified that she and Roddy left the Blue Moon Bar in Salem shortly before 2:00 a.m. Although appellant and Roddy had some beer, Roddy was not drunk and before he came to the bridge he was driving at a normal rate of speed of 35 to 40 m.p.h. As the Roddy car approached the bridge, about a mile or less from the bridge, appellant reached down and was looking for cigarettes and matches in her purse, which was on her lap. Appellant, while fumbling for the cigarettes and matches in the darkness, looked up and saw "blinding lights." When appellant started looking for the cigarettes and matches Roddy's car was on the right-hand side of the highway. Appellant had no recollection of what happened from the time she saw the "blinding lights" until after the accident occurred. During the time that appellant was fumbling for the cigarettes and matches she did not know where Roddy was driving on the highway.

State police officer Yeager arrived at the scene of the accident about 2:10 a.m. and found the Cadillac car in which appellant had been riding on the west side of the highway and the bus on the east side. The bus driver was there and the injured people

were lying in the bus' lane of traffic on the highway. Appellant was one of the injured persons and her legs were twisted. There were three passengers on the bus, Sue Thacker, Lillian P. McNulty and Mrs. Nick Roblez. There was a man lying closer to the bridge than appellant.

Yeager testified that from the northwest corner of the bridge to the back of the bus was 51'. From the end of the bridge to where appellant was lying was 44' 6". Tire marks leading to the bus begun 24' 8" from the bridge and covered a distance of 28'. Officer Yeager found a "gouge" mark in the bus' lane of traffic near the point where the vehicles collided. This gouge mark was in the north-bound lane of traffic, or right-hand lane of the bus. The gouge mark was in the north end of the bridge, some 6' 10" from the northeast corner of the bridge, and 12' 3" from the northwest corner of the bridge, thus placing it 2½' to 3' east of the centerline in the bus' north-bound lane of traffic. The tire marks, leading to the place where the Cadillac came to rest, started at the gouge mark in the north-bound or bus' lane of traffic, and were identified as made by the tires on the Cadillac. The tire mark that was on the road was blood, flesh, bone, etc., and was located north of the gouge mark. There were fresh black tire marks identified as having been made by the right wheels of the bus up against the east bridge railing, which started south of the gouge mark and continued north to the northeast corner of the bridge. There were tire marks and wood shavings hanging on a bolt at the northeast corner of the bridge. Dirt and glass were present on the highway, starting near and north of the gouge mark and spreading generally in the same arc as the path of travel which the Cadillac took to come to its position. The guardrail on the northwest corner of the bridge had been smashed and torn down.

Pictures of the two vehicles involved in the collision and of the scene of the accident were introduced into evidence, and among other things, showed the gouge mark on the highway and the tire marks of the bus referred to in Yeager's testimony. There was no damage to either of the front fenders, the front bumper, or either of the front headlights of the Cadillac. There was damage to the left rear and right front corner of the Cadillac, and also damage on the left rear door and on the right front door, extending up to the front headlight. Glass was broken from the left rear door of the Cadillac. On the bus, the only visible marks were on the left front and glass was broken from the left front headlight. There was quite a bit of blood on the left rear duals of the bus, and scuff marks on the right wheels of the bus.

■ We do not question the rule cited by appellant that in disposing of a motion for a directed verdict at the close of plaintiff's evidence, all testimony and all reason-

able inferences flowing therefrom which tend to prove the plaintiff's case must be accepted as true, and all conflicts and all evidence which tend to disprove it must be disregarded. Dickerson v. Montoya, 44 N.M. 207, 100 P.2d 904; Smith v. Ferguson Trucking Company, 58 N.M. 779, 276 P.2d 911; Ferris v. Thomas Drilling Company, 62 N.M. 283, 309 P.2d 225; Button v. Metz, 66 N.M. 485, 349 P.2d 1047; and Bell v. Ware, 69 N.M. 308, 366 P.2d 706.

■ However, we cannot ignore the undisputed physical facts and the testimony that the bus was on the extreme right-hand edge of its own lane of traffic. In Ortega v. Koury, 55 N.M. 142, 227 P.2d 941, we stated the applicable rule as follows:

> "Physical facts and conditions may point so unerringly to the truth as to leave no room for a contrary conclusion based on reason or common sense, and under such circumstances the physical facts are not affected by sworn testimony which in mere words conflicts with them. When the surrounding facts and circumstances make the story of a witness incredible, or when the testimony is inherently improbable, such evidence is not substantial. * * *"

■ Appellant argues that there was substantial evidence warranting the case to go to the jury. The trial court overruled this contention. Thus we consider what is meant by the terms "evidence," "inferences" and "conflicts," within the meaning of the substantial evidence rule as distinguished from mere possibilities or speculation. In Smith v. Ferguson Trucking Company, supra, this court stated that by "evidence" we mean facts as distinguished from speculation, and the mere possibility with respect to negligence or proximate cause is not "evidence" upon which a verdict can be based.

■ In Stambaugh v. Hayes, 44 N.M. 443, 103 P.2d 640, we stated the rule as follows:

> "A reasonable inference may be defined as a process of reasoning whereby, from facts admitted or established by the evidence, or from common knowledge or experience, a reasonable conclusion may be drawn that a further fact is established. * * *
>
> * * * * * *
>
> "An inference is not a supposition or a conjecture, but is a logical deduction from facts proved * * * and guess work is not a substitute therefor.
>
> " 'Where evidence is equally consistent with two hypotheses, it tends to prove neither.' * * *"

This court has repeatedly held that evidence or inferences which are inherently improbable are not inferences justifying submission of an issue to a jury. Ortega v. Koury, supra; Kutz Canon Oil & Gas Co. v. Harr, 56 N.M. 358, 244 P.2d 522; and

Addison v. Tessier, 65 N.M. 222, 335 P.2d 554.

■■ There is also the rule that there must be an actual contradiction of a substantial nature with regard to material facts before it can be established that there are conflicts in the evidence which require submission of issues to the jury. This court has construed the phrase "conflicts" to mean "substantial" differences relating to "material" facts, as distinguished from trivial differences relating to unimportant matters. Goldenberg v. Village of Capitan, 53 N.M. 137, 203 P.2d 370; Greene v. Esquibel, 58 N.M. 429, 272 P.2d 330; and Hugh K. Gale Post No. 2182, etc. v. Norris, 63 N.M. 312, 318 P.2d 609.

In the case of Ferguson v. Hale, 66 N.M. 190, 344 P.2d 703, the identical question raised in this case was before us. In Ferguson the trial court directed a verdict for the defendants, based upon testimony of eyewitnesses that the plaintiff's and the defendant's respective vehicles appeared at all times to remain on their respective sides of the highway, although the evidence showed that in fact a collision had occurred between the two vehicles. This court sustained the trial court and held that there was not substantial evidence upon which to base a recovery and that plaintiff had failed to meet the burden of proof. In reviewing the evidence in that case, we said:

"This evidence even with its reasonable inferences is insufficient to show actionable negligence on the part of the defendant. A verdict for the plaintiff could of necessity be based only on speculation and conjecture. Plaintiff has not made a case which would support a judgment in his favor.

"We therefore hold that the evidence introduced by the plaintiff is such that reasonable minds could not differ and that the directed verdict for the defendant was, properly granted."

Appellant also argues that not only was Transcontinental negligent before the collision, but that after the impact Transcontinental was separately negligent in failing to stop the bus within a reasonable time and space so as to avoid the injury to appellant. This contention is without merit. The witness, Mrs. McNulty, testified that the bus came to a stop after the accident within a couple of bus lengths, "as soon as possible." Upon getting out of the bus Mrs. McNulty noticed a lady lying at the rear of the bus with her legs in the path of the bus' wheels. There is no evidence as to what happened to appellant at or immediately following the time of impact between the two motor vehicles. How or at what instant appellant was thrown or fell out of the Cadillac is unknown. Even if we assume that appellant was thrown out of the Cadillac, there is no evidence that Transcontinental's driver could have observed this. The Cadillac disappeared from view at or an instant before the collision. It is

undisputed that the accident resulted in the amputation of appellant's legs; however, there is no evidence to show that a portion of her injuries had not already occurred as a result of the severe impact between the bus and the Cadillac. It is impossible from the evidence to segregate the effect of the injuries appellant received at the time of the impact from those resulting from contact with the wheels of the bus. It is pure speculation to assume that the proximate cause of appellant's injury was the result of what occurred after the impact and while the bus driver was bringing the bus to a stop. If the bus driver, under the evidence, was not negligent at the time the collision occurred, we cannot understand upon what theory he could be held to have been negligent for what occurred immediately after the impact.

■ Applying the principles hereinbefore discussed, and having reviewed the voluminous record, we hold that appellant's evidence is insufficient to show negligence on the part of appellee, Transcontinental, and that the trial court did not commit error in directing a verdict as to appellant and as to the cross-claim of the Roddy Estate.

This leaves for determination the question of whether the evidence, viewed in the light most favorable to appellant, together with all reasonable inferences therefrom, and all unfavorable evidence and inferences disregarded, was sufficient to submit the case to the jury as to American Linen and Colonial, on the issue of whether Roddy, at the time of the accident was acting within the scope of his employment.

The evidence shows that Colonial was incorporated on January 1, 1949, when it took over the assets of Las Cruces Laundry & Dry Cleaners. After that time Colonial operated both the business of Las Cruces Laundry and the business of American Linen. On October 1, 1955, American Linen was incorporated to operate the linen supply business. Colonial is in the laundry and cleaning business and American Linen rents linens and cotton goods to restaurants, bars, barber shops, motels, etc. The area of Colonial is Las Cruces, Hatch and points in between. American Linen covers the area as far west as Gage, north to Truth or Consequences, east to Ruidoso Downs, and south to all points between Las Cruces and Anthony. The two corporations operate the two types of business and keep separate books, records and payrolls. The stockholders of Colonial own the same percentage of stock in American Linen. Casper U. Lutz is president of Colonial and secretary-treasurer of American Linen. He is the sales manager and has jurisdiction over all of the routes, the route salesmen, the office, bookkeeping and the purchasing generally. Robert K. Risner is president of American Linen, shares management of Colonial and is its secretary. Mr. Lansdale and three employees, to-wit, a maintenance man, a

bookkeeper and a janitor, work for both corporations. The other employees are different in each corporation. The plant of Colonial is located on Church Street and the American Linen plant is on Main Street in Las Cruces, with an alley between the two streets separating the properties. Mr. Lansdale, Mr. Lutz and Mr. Risner draw salaries from both corporations. There was never an interchange between drivers of Colonial and American Linen, and Roddy never ran a route for American Linen.

Roddy was employed by Colonial as a route salesman in 1957, on a straight commission basis with a guarantee of $75 per week. He was furnished a 1953 International Metro truck with which to perform his duties. The truck is owned by Colonial. Roddy was also supplied with a uniform and could wear it whenever and wherever he wanted to. Roddy's duties were to pick up and deliver laundry and dry cleaning to customers on his route. Mr. Lutz testified that, theoretically, it was Roddy's duty to solicit business for Colonial.

On the date in question, Roddy was presumably making a delivery of a bundle of linen in his personal car to the American Legion Bar in Hatch for Colonial. Mr. Lutz testified that Roddy's route included delivery of towels and aprons to the American Legion Bar in Hatch for Colonial. On the night of the accident, the American Legion Bar in Hatch was a customer of Colonial, whose routemen delivered and picked up towels, aprons, etc., twice a week. The American Legion Bar originally was a customer of American Linen, but due to the fact that the bar opened later than the time when the American Linen routeman was in Hatch, the American Legion Bar became a customer of Las Cruces Laundry (Colonial), whose routeman was in Hatch in the afternoon when the bar was open.

Roddy usually commenced his duties at the Colonial plant at 8:00 a.m. and completed his work about 4:30 or 5:00 p.m., although there was no definite ending time. Mr. Lutz testified that all deliveries were made on schedule and that "You can almost set your watch by our routemen, the time they will be there." Although the record discloses that deliveries were sometimes made at irregular hours, Mr. Lutz testified that such late or emergency deliveries were generally made by him (Lutz); that routemen were not called upon to make night deliveries; that on the weekend or Sunday, routemen sometimes made special deliveries in a company-owned station wagon used for that purpose; and that it was an absolute company policy that no deliveries be made in other than company vehicles.

On March 19, 1959, Roddy finished his route at 4:30 p.m., went to the Colonial plant, parked the company truck, and reported that he had finished for the day. Sometime between 4:30 and 5:00 p.m. he went to Mr. Lutz' office and asked Lutz if he would like to go to Hatch with him.

Lutz answered that he "guessed not" and asked Roddy, "What are you going up there for?" Roddy said, "Oh, I forgot to deliver a bundle." Lutz then said, "Well, I wouldn't go up there tonight, it isn't at all necessary or important that you go." Later when Lutz started home Roddy was coming from the plant and they met on the sidewalk. Lutz stood by Roddy's car for a moment and then Roddy got into his personal car and left.

Roddy was next seen at the American Legion Bar in Hatch, putting up linens behind the bar, at approximately 9:00 p.m. After putting up the linens, Roddy came from behind the bar and started talking to appellant, who lived in Hatch. Roddy and appellant left the American Legion Bar about 10:30 or 11:00 p.m. on the night of March 19, 1959, and drove to the Blue Moon Bar in Salem so that appellant could introduce Roddy to Mannie Valles and try to get the linen business for that bar. Salem is five miles north of Hatch and was not in Colonial's territory. Appellant and Roddy arrived at the Blue Moon Bar at 11:00 or 11:30 p.m. and appellant introduced Roddy to Mannie Valles. They ordered beer and began playing the jukebox and pinball machines. About 11:30 p.m. or midnight, Roddy left appellant at the Blue Moon Bar and drove a man to Radium Springs, which is 23 miles south of Hatch. Roddy returned to the Blue Moon Bar in Salem about 1:00 a.m. At about 1:15 or 1:30 a.m., after Roddy had returned to the Blue Moon Bar, Roddy asked Mannie Valles who did his linen service and Valles told Roddy, "The American Linen Supply." Roddy and appellant stayed at the Blue Moon Bar and continued to drink beer and played the machines until closing time. Appellant and Roddy left the Blue Moon Bar shortly before 2:00 a.m. and were en route to Hatch when the accident occurred.

Much has been said by the courts in their opinions on the subject before us. While the rule in scope of employment cases appears to be simple, there has always been great difficulty in its application, and it has been frequently said that it is impossible to state it briefly and comprehensively so as to make it clearly applicable to all cases, because of the ever-varying facts of each particular case. Appalachian Power Co. v. Robertson, 142 Va. 454, 456, 129 S.E. 224; Alvey v. Butchkavitz, 196 Va. 447, 84 S.E. 2d 535.

Among the many factors to be taken into consideration in cases of this type may be mentioned the following: The nature of the employment; the right of control over an employee by his employer; the ownership of the instrumentality by means of which the employee inflicted the injury, and the fact of whether the instrumentality was or was not furnished to the employee by the employer; the use of the instrumentality with the knowledge and consent of the employer, and whether the employee had the

express or implied authority to make use of such instrumentality; and the time when the wrongful act was done in relation to the usual working time of the employee.

There is nothing in the record to show that Roddy had express or implied authority to make use of his personal car as he did. Absent a showing of such express or implied authority, the employer cannot be held liable, even though the employer may have benefited from the trip. Dr. Pepper Bottling Co. of Kentucky v. Hazelip, 284 Ky. 333, 144 S.W.2d 798. See Annotation, 52 A.L.R.2d 287 et seq., Employee Driving Own Car—Liability.

Restatement of the Law, 2d Ed., Agency, § 239, p. 529, states the rule as to use of unauthorized instrumentality as follows:

"A master is not liable for injuries caused by the negligence of a servant in the use of an instrumentality which if of a substantially different kind from that authorized as a means of performing the master's service, or over the use of which it is understood that the master is to have no right of control."

In Gallagher's Estate v. Battle, 209 Md. 592, 122 A.2d 93, 97, the court said:

" * * * It is now held by the great weight of authority that a master will not be held responsible for negligent operation of a servant's automobile, even though engaged at the time in fur-thering the master's business, unless the master expressly or impliedly consented to the use of the automobile, and *had the right to control the servant in its operation, or else the use of the automobile was of such vital importance in furthering the master's business that his control over it might reasonably be inferred.*" (Citing cases.)

In Morris v. Cartwright, 57 N.M. 328, 258 P.2d 719, this court stated the rule that liability of the master for the use of an automobile by the servant is created only when it appears that its use is with knowledge and consent of the master.

We have carefully read the voluminous record and fail to find any evidence from which a jury could have found that Roddy, at the time of the injury to appellant, was within the scope of his employment. It seems to us that much more must be shown by appellant in order to recover against Roddy's employer, than the fact that he was an employee, used his personal car, and that Roddy and appellant went to Salem at the hour which they did to try and obtain the linen business for Colonial; particularly in view of the evidence that when Roddy, at about 1:15 or 1:30 a.m., on the early morning of March 20, 1959, finally inquired as to who did the linen business at the Blue Moon Bar, was promptly told by Mannie Valles that it was done by American Linen. Colonial and American Linen, appellees herein, exercised no control what-

soever over Roddy's travels on the night of March 19, 1959, and the early morning of March 20, 1959. There is no evidence in the record to show that said appellees consented to the use of Roddy's personal automobile or that Roddy had express or implied authority to use his personal automobile as he did at the time in question.

Finding no error, the judgments of the district court are affirmed. It is so ordered.

MOISE and NOBLE, JJ., concur.

COMPTON, C. J., and CARMODY, J., not participating.