Second degree murder; sentence: ten years imprisonment.
On the night of November 20, 1971, Morris Carlisle, who had a prior conviction for burglary, was shot and killed in the home of the appellant. After an investigation, the Coroner of Jefferson County ruled the killing to be justifiable homicide. Almost five years later, the Birmingham Police Department reopened the case which resulted in the instant charge. Appellant charged that the case was reopened following several years of conflict between him and certain police officers in connection with his operation of a local club, The Wrought Iron Lounge.
Statements given to police officers by the appellant clearly made out a case of justified homicide. The State, through circumstantial evidence, sought to prove an unlawful homicide.
Birmingham Police Officer Robert J. Lamb and his partner, responding to a call, went to the residence of the appellant on November 20, 1971. They arrived shortly after midnight and within a few minutes, the Jefferson County Coroner, J.O. Butler, and other officers arrived at the scene. When Lamb and his partner entered the house, they observed a black man lying in a hallway. A piece of broken window pane glass was lying next to the hand of the deceased.
Lamb interviewed the appellant Kent who gave an account of the killing. Appellant told Lamb that he had awakened to discover the deceased coming from a back bedroom holding a piece of broken glass to the throat of the appellant's child. He stated *Page 510 
that the deceased made sexual advances toward Mrs. Kent, but the appellant attempted to talk the deceased into leaving peacefully. The appellant told the deceased that he would open the door for him to leave, and then the appellant stepped into the living room and took a rifle from a wall rack, loaded it, and stepped back within sight of the deceased. He stated that Mrs. Kent screamed something to the effect that the deceased was cutting the child. At that time, he shot the man, Mrs. Kent grabbed the child, and the man fell to the floor.
Officer Lamb stated that he was informed that Mrs. Kent and the baby were at a local hospital. He went there to verify the appellant's story. Upon arriving, he observed doctors working on the child who had a "jagged, very deep wound" on the side of his throat.
Officer Jeffery E. Webb testified that on the date of the homicide, he and Police Sergeant M.E. Guillion went to the appellant's residence to investigate the shooting. He went back to the appellant's residence on October 27, 1976, (almost five years after the homicide) with Police Sergeant J.E. Rhodes. He identified a diagram of the appellant's house which Rhodes had made on that occasion. In the first instance, he had a conversation with the appellant in the presence of Officers Lamb and Guillion. He examined the body and found a wound in the abdomen on the right side of the navel. He observed no other wounds. He testified that the investigation was dropped when the coroner ruled the homicide to be justifiable. He stated that the coroner had consulted with him prior to making the ruling of justifiable homicide. The story which the appellant told him was essentially the same as that told to Officer Lamb.
Officer Webb testified that he examined a piece of glass which was in the right hand of the deceased and found only a small amount of blood on it. He saw no blood on the deceased except around the gunshot wound.
Webb examined the appellant's home and found a partially broken window in a rear bedroom. He had examined the area around the window, but did not see anything that looked like fingerprints that might be retrieved; however, he did see smudges on the glass. He observed that dust on the windowsill had apparently not been disturbed.
Officer Webb found a pair of shoes and a hat outside the rear bedroom window. The shoes were laced up and tied when he found them. The deceased was not wearing shoes, but was in his stocking feet when the police officers observed his body. Officer Webb testified that there were perhaps a dozen officers present during the investigation, but that he, Sergeant Guillion, Officers Little, Jones, Lamb, and Gardner and the coroner actually conducted the investigation which he admitted was thorough. A two-man fingerprint unit worked at the scene until approximately 2:00 A.M. on that occasion. The witness testified that, although he conferred with the coroner, he did not agree with the coroner's conclusion and had expressed his doubts to his supervisor and partner. He stated that he was aware that the deceased had a record for burglary.
Sergeant James R. Little testified that he took photographs and fingerprints at the scene of the homicide on the night in question. He was not able to obtain any identifiable fingerprints from around the window frame because of the rough surface.
Wayne Poole testified that he had known the appellant for ten or twelve years. He stated that in July or August of 1972, he was at the appellant's place of business, The Wrought Iron Lounge. He had consumed approximately two-fifths of liquor at the time and was in a rage. He had been in a fight earlier and wanted the appellant to go with him to retaliate against some people. When appellant would not go with him, Poole accused appellant of killing Carlisle. Poole said the appellant at that time stated to him that it would have been easy for him to have killed the deceased and made it look like self-defense. He testified that Kent told him he could have shot the deceased and then "pull the skin up on the baby's neck and let it go back and all that crap." *Page 511 
(He apparently meant that appellant could have pulled the outer skin away from the neck and inflict a superficial cut without seriously injuring the child although his testimony is not completely clear on this point.) However, he then stated that Kent told him that he was just telling him that to get him to calm down and that the killing had actually occurred as he had related earlier — "the guy broke in on him, threatened him and his wife, and cut the baby's throat." Poole admitted that he was drunk when he talked with the appellant in 1972 and that the appellant was trying to get rid of him at the time.
Poole admitted that ten years earlier he had been convicted of burglary, grand larceny, and automobile theft. Four years earlier he had been convicted of attempted murder, buying and receiving stolen property, grand larceny of an automobile, and conspiracy to pass counterfeit money. He admitted to serving time in the penitentiary and that he was out on both state and federal paroles at the time. He said no threats were made by the police in order to get him to talk to them; however, he was afraid that if he did not do so, his probation would be revoked.
Officer Little was reexamined and testified that he found some glass under the rear window of the appellant's house which appeared to have been there from some length of time. He stated that the glass was on the ground and was water spotted and had debris on it, however, he never tried to put the pieces of glass together to determine whether they came from the window. In fact, the glass had since then been disposed of, and he did not know what had happened to it. He admitted that he did not mention to anyone that the glass looked weathered until approximately two months before the trial. He did not check that particular glass for fingerprints, neither did he find prints on the glass that was remaining in the window.
Wilbert Gratton, the uncle of the deceased, testified on behalf of the State. He last saw deceased on the day of the homicide. Earlier on that date, he had received several telephone calls for the deceased from a person whose voice he said he had heard before.
After the shooting, Gratton went to the coroner's office where he saw the deceased's billfold, driver's license, money, and a "little telephone book." He said that prior to that time he had looked through the telephone book and had seen the name "Kent" and a telephone number written therein. He first testified that there was no other name in the book, but on cross-examination, he stated that there were other names in the book, all of which were relatives of the deceased. He stated that he did not know what happened to the book after he saw it at the coroner's office. The telephone number was never connected with the appellant by the State's evidence.
Gratton testified that on one occasion prior to the date of the crime a white man of heavy build with blonde hair had come to his house and asked for the deceased. He said the man drove a motorbike. The motorbike was never connected with the appellant by the evidence in the State's case in chief. Gratton also stated that he had heard a man's voice on the telephone several times. He stated that he recognized the voice on the telephone to be the same voice of the white man who visited his house on the day Morris Carlisle was killed. In his testimony before the jury, he did not connect the voice on the telephone with the appellant.
Gratton admitted to having given police a statement on September 29, 1976, and another statement on January 28, 1977, three days prior to the trial. Both of those statements were admitted into evidence and read to the jury. In the first statement, Gratton told police that the deceased had a few telephone calls, but he did not recognize any of the voices. When asked if he could tell whether they were black or white, he answered that they were "colored." The only time he had seen Carlisle associate with a white person was on the one occasion when the white man came to the house and asked to see Carlisle. Carlisle told Gratton the white man was someone he met in *Page 512 
Draper. In the first statement, he did not identify the white man who visited his house, neither did he state that he recognized the voice of the white man as having called before.
In the second statement, given three days prior to the trial, Gratton stated that between the time Carlisle got out of prison and the date he was killed, a white man called the house on the telephone on several occasions. The white man never left his name. Gratton stated that he had looked through the appellant's address book in October of 1971, a month before Carlisle was killed. He stated that he saw the name "Kent" written in the book. He asked Carlisle about the name Kent and Carlisle said he was "the white guy he had met."
In the second statement, Gratton stated that when Morris Carlisle would leave the house for work, he often carried a plastic shaving kit with him which contained marijuana. The following portion of that statement was read to the jury by defense counsel:
 "Q. What did you think Morris was doing with that marijuana when he took it to work with him?
"A. I think — you know — he was selling it.
"Q. Who was Morris selling that marijuana for?
"A. I reckon this white guy — Kent."
Even though read by defense counsel, this was the rankest of speculation and conjecture on the part of Gratton and is not evidence which will support even an inference of guilt.
Gratton testified that the police showed him some photographs of Kent and stated that Kent was the one that had killed his nephew Carlisle. On cross-examination he testified that he was shown the pictures at the time of the September statement and then changed his testimony to the effect that it was at the time of the January statement, then stated that he was not shown the pictures in January, but was shown them in September, and then changed his testimony twice more concerning when he was shown the photographs.
 "Q. Now at the time this last statement was made, did Captain Myers show you pictures of Mr. Kent who is sitting over at the table? When I say `the last' I mean the one this last Friday? I don't want to confuse you.
"A. No, sir, he didn't show me no pictures.
* * * * * *
 "Q. Well, when was it he showed you the picture of Mr. Kent that you testified about?
 "A. That night we first, you know, back in September when he first showed me no picture. Back in September.
 "Q. Well, did he tell you who the pictures were, the name of them and so forth? Did Captain Myers tell you that?
 "A. No, they didn't tell me until I, you know, picked the picture out. Then he told me.
 "Q. How many different kinds of pictures did he show you of Mr. Kent?
"A. About four to six, you know.
"Q. How many?
"A. About four or five.
* * * * * *
 "Q. And are you sure that that was in September rather than last Friday that those pictures were shown of Mr. Kent? Think back now, if it wasn't last Friday. I don't want to confuse you, but was it last Friday before you made this last statement that he showed you the pictures of Mr. Kent?
"A. Yes, I think it was.
"Q. It was the last time, wasn't it?
"A. That's right.
* * * * * *
 "Q. . . . After this statement was made last Friday, did you bring Mr. Kent into it after being shown those pictures?
 "In this statement that was made in September, there was no mention of Mr. Kent there in any way, was there?
 "If you want to, if His Honor will allow it, take them and look through, but look through and see if it is September. Was *Page 513 
any statement made concerning Mr. Kent and it was only after last Friday after you had been shown the pictures of Mr. Kent and had been told who it was that you mentioned Mr. Kent in your statement?
 "A. No, sir. They tell me, you know, that is the man that shot him. They didn't call the name.
"Q. What was that now?
 "A. They didn't say it was Kent, just told me that was the fellow that shot him.
 "Q. He didn't say it was Kent, but he showed you the picture of Kent and said that was the fellow that shot him?
"A. That's right.
"Q. And that was last Friday, then?
"A. No, sir, not last Friday. No, in September.
 "Q. But last Friday when you made this last statement, was that the time you were shown the five pictures of Kent?
"A. That's right.
"Q. That was last Friday, wasn't it?
"A. That's right.
 "Q. Now in your statement in September, you didn't mention anywhere anything about Mr. Kent, any notebook or anything else, did you? Is that right?
"A. That's right."
Gratton testified that he had given police statements on seven separate occasions at which time his statement was written up. He had not seen the other five statements, they were not in court, and the only ones he had seen were the two produced in court. Gratton's testimony in court as well as in the prior written statements is confusing, conflicting, and inconclusive.
Jay Glass, a pathologist's assistant employed at the Cooper-Green Hospital in Birmingham, testified for the State concerning the exhumation and examination of the body of Morris Carlisle in 1976. His autopsy revealed that the bullet entered just to the left of the navel and went in at a ten degree angle toward the spinal column from left to right. The defense stipulated that the cause of death was from the gunshot wound inflicted by defendant, nevertheless, the State continued to elicit detailed testimony concerning the autopsy.
Mrs. Imogene Wilson testified on behalf of the State. She remembered the occasion of the shooting in question, but did not remember the date. She stated that she went with her husband to a house where his three sons resided. They went upstairs, but found that the boys were not there, and on going back downstairs, Oscar Kent opened the door to his apartment. Mrs. Wilson said that he had a gun in his hand and said that he had shot someone. They entered the apartment, to the best of her memory, through a small archway where she saw a man lying on the floor of what she thought to be a room. She said Mrs. Kent was sitting on a sofa holding a baby and that both Mrs. Kent and the baby were crying. She did not see any blood because she did not examine the baby. Mrs. Wilson immediately returned to her car, and her husband brought her a soft drink. She remembered nothing from that point on.
Police Officer Kenneth Lewis testified that he was present when the body of the deceased was exhumed, and he identified a photograph of that body. He testified that he attempted to take fingerprints from the body, but was able to print only a portion of the right thumb and palm.
Sergeant Richard Zales, after a voir dire examination, testified concerning his investigation of the case. He testified as to a statement the appellant had given him on October 27, 1976, after the case had been reopened. Kent's statement to Officer Zales was substantially the same as the one he gave to Officers Lamb and Webb, set out earlier in this opinion.
On cross-examination Zales admitted that he was aware that Kent had been investigated for selling narcotics. He said Kent knew the case was reopened, however, Kent cooperated fully with the investigation. Zales likewise testified that Wilbert Gratton, the uncle of the deceased, had been interviewed about ten times by the police between the interviews of September 29, 1976, and of January 28, 1977. Furthermore, *Page 514 
Zales said that he had talked with Gratton on three of those occasions.
Dr. James N. Buttram, Toxicologist and Laboratory Director for the State Department of Toxicology and Criminal Investigation, testified for the State. The prosecution attempted to prove through Dr. Buttram the following: (1) that the deceased would not have fallen in the position shown in the photographs of the body taken at the scene of the crime; (2) that a person being shot with a rifle would not normally continue to grasp a piece of glass while falling to the floor, absent the occurrence of cadaveric spasm; and (3) that it was highly unlikely that cadaveric spasm occurred in the instant situation.
The State attempted to lay the predicate for Dr. Buttram's testimony as an expert witness by having him testify as to his qualifications as follows:
 "I have a B.S. degree earned at Auburn University and a Ph.D. degree earned at the University of Tennessee Medical Unit, Memphis, Tennessee. I spent approximately one year in post-doctoral study and research at the University of Georgia in the Institute of Comparative Medicine. I joined the department after that period of study and research and have been employed with this department in excess of three years.
 "During this period of time I have received extensive on-the-job training under the direction of Dr. C.J. Rehling, State Toxicologist. I have also studied with Dr. Neil Hoffman, forensic pathologist, now with the medical examiner's office in Tulsa, Oklahoma.
 "During this period of time, Dr. Hoffman was located at Lister Army Hospital in Fort Rucker, Alabama. I have received training under Dr. Keith Hester, pathologist and coroner, Montgomery County, Alabama, and have participated in in-service training seminars and short courses, both within our department and in regional and national meetings.
 "I am a member of the Southern Association of Forensic Scientists, the American Academy of Laboratory Directors and the International Association of Forensic Toxicologists."
Dr. Buttram later testified that he earned his Ph.D. degree primarily in the area of pharmacology, "drug action," with a minor in physiology, "a study of the function of the parts of the human body in life." He testified that he had been involved in more than 450 examinations of dead human bodies and in investigations of those deaths. On "many occasions," those deaths investigated were caused by gunshot wounds. Dr. Buttram had never witnessed an actual shooting, however. After extensive voir dire examination, the trial court allowed Dr. Buttram to testify by expressing his opinion as an expert witness.
Dr. Buttram was allowed to examine photographs of the scene of the shooting depicting the body of the deceased showing a piece of glass lying partially over the right hand. Over objection he was allowed to testify that, "I do not believe that the photographs depict the phenomenon of cadaveric spasm." Dr. Buttram earlier testified that cadaveric spasm was an uncommon phenomenon which occurs "whenever a dead individual is found tightly grasping an object." He stated that in all of his examinations of dead bodies, he thought he had only seen that phenomenon one time. However, the defense never contended that cadaveric spasm occurred in this case. During voir dire examination, he stated that it is a rare circumstance that "is not well studied."
In answering a hypothetical question by the prosecution (assuming no cadaveric spasm occurred, assuming that the person was shot from approximately eight feet with a 7.65 millimeter Mauser rifle, assuming that the bullet stayed within the body, and assuming the body fell backwards), he stated that "it would be an unlikely event" that the glass would have stayed within the hand of the person when he fell to the floor.
On cross-examination, the following occurred:
 "Q. Well, let's get away from cadaveric spasm. They just happen once every so many times and it is very unlikely to be a *Page 515 
cadaveric spasm. That is correct, isn't it? Very unlikely?
"A. Yes, it is rare.
 "Q. Very rare. Now assuming it is not that and that this man is holding this glass and is simply shot, he falls, he is holding that glass in his hand, when he falls his hand relaxes and the glass is lying there on top of his hand. Wouldn't this picture designate what would ordinarily happen in that transaction in the course of being shot like that?
"A. With the supposition you have stated, yes.
 "Q. So there is nothing unusual about that, it would just be the average course of events under the statement I have given you, wouldn't it? Nothing unusual about it?
"A. Under the statement you have given me, yes.
 "Q. Yes. And it could be reasonably assumed from that that he was holding the glass, was shot, held onto it, fell and died and his hand relaxed and the glass is there, would it not?
"A. That is possible."
At the end of Dr. Buttram's testimony, the State rested its case in chief. The defense then moved to exclude the State's evidence as being insufficient to submit to the jury. The trial court overruled the motion to exclude, and the defense put on its witnesses.
In considering the question as to whether the trial court correctly overruled the appellant's motion to exclude the State's evidence, we may only consider the evidence which was before the trial court at the time the motion to exclude was made. Williams v. State, Ala.Cr.App., 340 So.2d 1144, cert.denied, Ala., 340 So.2d 1149 (1977); Tooson v. State,56 Ala. App. 613, 324 So.2d 327 (1975), cert. denied, 295 Ala. 426,324 So.2d 333.
The fact that the appellant shot the deceased and killed him is not in dispute. The issue is whether the appellant was legally justified in shooting the deceased. In Champion v.State, 35 Ala. App. 7, 44 So.2d 616 (1949), the Court of Appeals stated:
 "Every killing is unlawful unless expressly excused, or justified by the law. A homicide being shown, it is incumbent upon the defendant to prove circumstances in mitigation, excuse, or justification, unless shown by the evidence produced against him. . . . The degree of the mitigation, the validity of the excuse, or justification are questions for the jury. . . ." (Emphasis supplied.) (Citation omitted.)
In testing the appellant's motion to exclude the State's evidence, we must review that evidence in the strongest light favorable to the State. Since every killing is presumed unlawful unless proved to be justified by law, and since the use of a deadly weapon infers malice, it is necessary to determine whether the State's evidence shows a justification or excuse for the homicide in favor of the appellant sufficiently strong to refute the presumption that the homicide was both unlawful and committed with malice.
By the State's own evidence, the appellant's version of the shooting was put into evidence. The appellant and his wife were the only eyewitnesses to the killing. The appellant's statements given to police officers and elicited in the State's case in chief show prima facie that the homicide was legally justifiable, i.e. it was committed in defense of the appellant's home and family against an intruder. The issue then is whether, by the end of the State's case in chief, the State had presented sufficient circumstantial evidence to prove an unlawful, malicious killing and overcome the initial evidence of justifiable homicide.
The prosecution must prove each of the elements of murder, and that proof must be positive enough to show there was no justification or that the appellant was not free from fault in bringing on the fatal encounter. There is no burden of proof on a defendant in a homicide case except as may be germane under a special plea of not guilty by reason of insanity. Payne v.State, 52 Ala. App. 453, 293 So.2d 877 (1974). *Page 516 
When the issue of self-defense is present (through the State's own evidence in this case), the State must prove that the accused did not act in self-defense in the sense that the State must prove a prima facie case of unjustified homicide.Mack v. State, Ala.Cr.App., 348 So.2d 524 (1977). Our use of the term "self-defense" encompasses the defense of one's home or a member of one's family. The right to defend another is coextensive with the right to defend one's self. In such a case, the accused steps into the shoes of the person whom he defended, and he has the same right as that person did in self-defense. This right extends not only to the person assailed, but also to any members of his family. Collier v.State, 57 Ala. App. 375, 328 So.2d 626, cert. denied, 295 Ala. 397, 328 So.2d 629 (1975). It has long been the law in Alabama that, if an assault on one's house is made under circumstances which would create a just apprehension of imminent danger to person or property in the mind of a reasonable man, the owner may act upon appearances and kill the assailant. Carroll v.State, 23 Ala. 28, 58 Am.Dec. 282 (1853).
To meet the burden of proof to sustain a charge of second degree murder, the prosecution must show an unlawful killing with malice, but without deliberation or premeditation. The State's own proof introduced the elements of justification via defense of one's premises and family from a deadly assault. The State's initial proof in this regard rebuts the presumption that the homicide was unlawful and that the use of the deadly weapon by appellant was malicious. Whether the State's further evidence is sufficient to prove the killing to be without justification and with malice beyond a reasonable doubt and to a moral certainty remains to be seen. To make such a determination, we must review the State's evidence and analyze those circumstances which may tend to or appear to incriminate the appellant.
Wayne Poole, an admitted felon, was on parole at the time he gave the police a statement. He was apprehensive that he might be jailed and have his parole revoked if he did not cooperate. He had to recall a conversation from almost five years earlier that took place while he was intoxicated from drinking two-fifths of liquor. At the most, his testimony was that the appellant humored him by saying he could have faked Carlisle's threat to his family, but that he actually did not do so.
An accused stating that he could have committed a crime, but that he actually did not commit it, is not evidence that he indeed offended the law. Such a statement is not inculpatory in nature since it only states that a certain act could have happened, but did not happen. As stated in Taylor v. State,30 Ala. App. 316, 5 So.2d 117 (1941):
 ". . . `proof which goes no further than to show an injury could have occurred in an alleged way does not warrant the conclusion that it did so occur.'"
The possibility that the appellant may have "faked" the threat to the child by inflicting a light superficial cut was disputed by other positive evidence on behalf of the State. Officer Lamb testified that he observed a "jagged, very deep wound" on the child's neck.
Wilbert Gratton's testimony in the presence of the jury does not shed light on the issue of the guilt or innocence of the appellant. Only by speculation can one connect the appellant with the deceased at all through Gratton's confusing and contradictory testimony. After reviewing his testimony numerous times, we are still uncertain whether the appellant was identified by Gratton as being the white man on the motorbike which visited his house. What Gratton "thought," "guessed," or "reckoned" was not evidence to support a murder charge.
The portions of Officer Webb's testimony unfavorable to appellant were (1) that the piece of glass found next to the hand of the deceased evidenced only a small amount of blood, and (2) dust on the bedroom windowsill appeared undisturbed.
Dr. Buttram's testimony could be summarized down to this: (1) It would be an *Page 517 
unlikely event for a body to fall in the position depicted in the photographs of the deceased, but (2) it was possible.
Many of the other State's witnesses testified as to facts or circumstances having no bearing on the question of appellant's guilt vel non of an unjustified and illegal homicide. The many circumstances hypothesized or testified to add up to nothing more than a suspicion that appellant may have killed Carlisle and then "staged" the scene to give the appearance that he shot an intruder. As stated in Parker v. State, 280 Ala. 685,198 So.2d 261 (1967):
 ". . . This merely showed a possibility that this appellant may have committed the offense. However, the possibility that a thing may occur is not alone evidence even circumstantially, that the thing did occur. Taylor v. State, 30 Ala. App. 316, 5 So.2d 117. See especially Lang v. State, 252 Ala. 640, 42 So.2d 512."
To authorize the submission of a criminal case to a jury, the State must submit substantial evidence tending to prove each element of the offense. In view of the presumption of innocence, which is a matter of evidence attending an accused in every trial, a mere scintilla of evidence is insufficient to present a question of guilt to a jury. Ex parte Grimmett,228 Ala. 1, 152 So. 263 (1933).
In reviewing the trial court's action in overruling a motion to exclude, the standard for review is whether at the time the motion was made legal evidence was submitted to the jury from which the jury could by fair inference find the defendant guilty. Stewart v. State, Ala.Cr.App., 350 So.2d 764 (1977). This court in applying such a standard will not substitute itself for the jury by attempting to determine the probative force and weight of the evidence. Toles v. State, 170 Ala. 99,54 So. 511 (1911); Leach v. State, 24 Ala. App. 423, 136 So. 493
(1931). Our task is to determine if legal evidence was presented from which the jury by fair inference could have found the defendant guilty beyond a reasonable doubt. Howell v.State, Ala.Cr.App., 339 So.2d 138 (1976).
An inference is a permissible deduction from proven facts which the jury may weigh in reaching its decision. Roberts v.State, Ala.Cr.App., 346 So.2d 473, cert. denied, Ala.,346 So.2d 478 (1978). "It is a logical and reasonable deduction from the evidence and is not supposition or conjecture. Guesswork is not a substitute. Stambaugh v. Hayes, 44 N.M. 443,103 P.2d 640 (1940); Bolt v. Davis, 70 N.M. 449, 374 P.2d 648
(1962). A supposition is a conjecture based on the possibility or probability that a thing could have or may have occurred without proof that it did occur. Louisville N.R. Co. v.Mann's Adm'r, 227 Ky. 399, 13 S.W.2d 257 (1929)." Thomas v.State, Ala.Cr.App., 363 So.2d 1020 (1978).
While reasonable inferences fron the evidence may furnish a basis for a conviction, mere possibility, suspicion, or guesswork, no matter how strong, is insufficient to overcome the presumption of innocence. Thomas, supra.
After careful review, we have determined that the State did not present substantial evidence in its case in chief that the appellant committed an unlawful, malicious homicide. We are of the opinion that the evidence was not substantial to support a fair inference that the appellant committed the crime charged. Thus, applying the standard of review hereinabove stated, we are of the opinion that the defendant's motion to exclude the evidence should have been granted, and that refusal to do so constituted reversible error. In light of this finding, it is unnecessary to comment on the many other grounds of error alleged by the appellant which we have also reviewed.
REVERSED AND REMANDED.
All the Judges concur. *Page 518