The appellant, Lockett, was indicted for the offense of murder and was found guilty by a jury of the lesser offense of manslaughter. He was subsequently sentenced to ten years' imprisonment.
At trial, State's witness Henry Bradley, who had prior convictions for theft and armed robbery, testified, as follows: On the evening of August 22, 1984, he went with Raymond Jude (the victim) and Morris Askins to 2830C Turf Avenue to buy marijuana. He had been with Jude to this residence on several occasions to buy marijuana. When Jude and he went up to the designated apartment, Lockett came to the door. They told Lockett that they wanted to buy some marijuana. In response, Lockett said that he wanted only one person at a time to enter the apartment. So Jude went inside alone because he had the money. Only the screen door was closed behind him. While Jude was inside, Lawrence Davis and Ronny Townsend were on the porch and Askins was in the car. After Jude had been inside three to five minutes, he heard "a lot" of shooting and saw a lady run out of the house. After he looked through the screen door and into the house and saw Jude lying on the floor, he left with Askins to summon an ambulance. Although he saw Jude with no weapon or a sack, he did not know if Jude had a gun. Bradley finally testified that he did not have a weapon or a bag and that he never went into the apartment.
Lawrence Davis testified, as follows: As he approached the apartment where Lockett resided, which was located on Turf Avenue, between 8:30 p.m. and 9:00 p.m., he saw two people standing on the porch and right outside the door. One was Henry *Page 1282 
Bradley. He did not observe anything in either of the men's hands. The screen door was closed, but the main door was open. He tried to open the screen door, but it was locked. When he did so, he caught a glimpse of Jude. While standing on the porch with the other two men, he attempted to converse with them, but neither one said anything. Then, he heard five or six shots fired inside the house, and he ran to his car which was parked across the street. At this time, someone who was screaming ran out of the apartment. He saw Bradley and his companion still standing on the front porch, but before he could drive away, Bradley and his companion also ran from the porch. He went home and saw Lockett in his front yard. At Lockett's request, he took Lockett to the emergency room.
The prosecution also presented evidence that police officers arrived at the Turf Avenue address at approximately 9:00 p.m. As one officer entered the apartment, he observed that the glass window in the screen (storm) door was broken out, that the front door was open, and that the front door had a mark on the outer side where something had hit it with force. The back door was also open. The victim, who was already dead, was lying on the floor; he had a .22 revolver in his right hand. No one else was in the apartment. The officer also observed a "wad" of money on the floor on the right-hand side of the deceased; more than a hundred little, yellow coin envelopes near the body; two briefcases on the couch, one of which contained "greenish-brown plant leaflike material" and a little yellow envelope; approximately fifty manila envelopes on the same couch; and a box which was located three to four feet from the deceased and near the couch and which contained a plastic bag containing green, leafy material. The officers also observed, on the ironing board in the kitchen, some more money; a white powder substance on a piece of paper; a knife; an ashtray; and a noodle strainer.[1] Identification belonging to Ellie Moore and Lockett was also found in the apartment.
From studying the scene, one investigator concluded that ten shots had been fired from Jude's weapon and the weapon used against Jude. Three of those ten bullets were recovered from Jude's body. The revolver taken from Jude's hand contained one live round and five spent rounds. In addition, there was evidence of a larger caliber weapon being fired into the front door and the bullet ricocheting into the storm glass door, thereby breaking the glass, and, also, being fired into the living room wall where the victim was found. A sawed-off 12-gauge shotgun was also recovered from the kitchen.
While investigating at the scene, Investigator Parker talked with a woman who was next-door. She identified herself as Jeanette Saxon. Upon inquiry, Jeanette stated that she did not know who lived in the apartment where the shooting occurred and that she had not been in the apartment. After Jeanette was taken to police headquarters, an elderly woman claiming to be her mother came to the back door of the apartment and stated that she wanted her daughter's wallet. The officers had found a lady's wallet on the floor near the back door.
While the investigation at the scene was in progress, Investigator Renfroe went to Huntsville Hospital at approximately 10:00 p.m. and talked to Lockett, who was in the emergency room. Renfroe asked Lockett what had happened; Lockett responded, "Don't you know?"; and Renfroe answered, "No." Lockett then stated the following: He had been shot during the commission of a robbery; that the person, who had tried to rob his girlfriend and him, shot him; that, after he shot back several times, he ran out the back door; that when he jumped the fence, he dropped his gun; and that he went to Lawrence Davis, who took him to the hospital. He also identified the victim as Raymond Jude. At some point during his visit, Renfroe talked with the *Page 1283 
treating physician, who stated that Lockett had been shot in his right side, but that he would be treated and released that night. Before leaving, Renfroe left uniformed officers to stand by Lockett. Investigator Parker, at 1:25 a.m., instructed one of these officers to transport Lockett to police headquarters when he was released.
After Lockett was taken to headquarters, Parker advised him of his Miranda rights at 2:20 a.m. After Lockett acknowledged that he understood each right and that he was not being threatened or promised anything, he stated that he wished to talk to Parker. Lockett first stated that he lived at 3015 Holmes Avenue, but that he sometimes stayed with his girlfriend, Ellie Moore, at 2830 Turf Avenue. Then, he gave the following rendition of events: He arrived at his girlfriend's house at approximately 8:00 p.m. and talked with Ellie and the baby; that, at approximately 8:00 p.m., his sister, Jeanette, arrived; that, while he was in the bathroom, he heard a knock on the door; that, when he came out of the bathroom, he saw Jude and Henry Bradley inside the apartment; that they advised him that they had some drugs to sell to him; that, later, Jude pulled a gun from the bag he was carrying, and he was able to get his gun from a kitchen cabinet; that Jude shot him, and he returned fire, emptying his gun; and that he then fled out the back door to Davis's house. Lockett further stated that both Jude and Bradley were armed and that he dropped his gun as he was going over the fence. He also admitted that he did not know what happened to Jude's or Bradley's sack after the shooting.
Some time after this conversation, Lockett was placed under arrest on a charge or charges not related to the instant offense; he was not charged with murder at this particular time.
Later in the morning, at approximately 8:00 a.m., Investigator Renfroe found a .38 caliber revolver in the backyard next door to the scene of the killing. The revolver's chamber contained five spent shells. Renfroe testified that the revolver was found approximately where Lockett said it was.
At approximately 10:00 a.m., Lockett was again advised of hisMiranda rights and waived those rights. After Lockett made several telephone calls in an attempt to locate Ellie Moore, he gave another oral statement to Renfroe, which, as related by Renfroe, was as follows:
 "He said that he was in the bathroom, he came out of the bathroom, when he came out of the bathroom there were two black males in the apartment, who he identified as Raymond Jude and Henry Bradley. He said that they had two sacks in their hands, and he said that they had some kind of property they were wanting to swap for dope. And he said at that point he started walking to the kitchen, which is located right off the living area, and he was standing in the doorway to the kitchen, living room when Raymond Jude pulled a gun from one of the bags.
 "He said that he pointed the gun at him and fired it hitting Mr. Lockett, and at that point, Lockett first said that he got his gun from the top of the refrigerator, he later said that it was in his back pocket. He returned fire, he said he fired five times, he knows that he hit him once, but he didn't know if he hit him anymore times than that.
 "He said at that point he took off running, ran out the back door, jumped the fence, lost his gun in the process, went to a guy by the name of Sarge's house, and he carried him to the hospital."
After this oral statement and at approximately 11:00 a.m., Investigator Parker entered and the three "basically . . . went over the statement given." Then, Lockett wrote his statement, as follows:
 "I arrived at Turf Street at seven o'clock, eats and go to the restroom, wash and change pants.
 "Of course, I hear what's going on, but can't see and don't think I have to see everyone. Raymond Jude and Henry Bradley come to the door, Ellie don't know them and I don't myself know the third person standing in the background. *Page 1284 
 "They say have you got anything, I said, I am not holding and they leaves. They came back later, about ten minutes, and asked for Ellie and did she have any smoke. She called me to the door with her and Raymond conned his way in, and the others say they don't have to come in.
 "Now, Raymond is in and trying to cope a nickel. Henry is standing at the door, one foot in, one out, looking with his hands in his pockets.
 "Me and my sister is walking towards the stove as we smell trouble. I put my gun in my back, Jeanette is still holding the baby. Raymond asked Ellie for money, she refused to give. Jude pulled his gun on Ellie and I go for my piece. I am hit in the side as he takes two bullets, maybe more. He fall hurt, I am still standing. Henry runs, Ellie screams, my sister holler and run, and I go, too."
When asked what happened to the alleged property brought in by Jude and Bradley, Lockett stated that he did not know.
On this same day, August 23, Dr. Joseph Embry performed an autopsy on Jude's body. Embry observed that Jude had been shot three times, and he opined that one of these wounds, a wound to his left chest, caused his death. One wound was in his left back, fifty-two and three-fourths inches above his left heel and two and three-fourth inches to the left of the middle of his back. This wound was caused by a bullet which went downward (back to front) about forty-five degrees and, from his left to his right, about forty-five degrees. Another wound was in his left chest, almost in his back, twelve inches from the center of his chest and fifty and five-eighths inches above his left heel. The bullet causing this wound went upward ten degrees and from his left to his right seventy degrees, which would be twenty degrees forward. The third wound was in Jude's left hip area, thirty-five inches above his left heel (which is below the waist). This bullet went from front to back ten degrees and upward eight degrees. The victim was sixty-eight and a quarter inches tall, and he weighed one hundred eighty pounds.
At trial, Investigator Parker testified that Morris Askins was identified by Bradley as the driver who drove Jude and Bradley to the scene, but that the law enforcement officers had never found Askins. He further admitted that the officers were unable to locate Ellie Moore, who has outstanding warrants for her arrest, and that he had never talked to Ronny Townsend.
After the prosecution presented this evidence and rested, the defense moved for a judgment of acquittal, which was overruled.
 I
Lockett contends that the trial court erroneously denied his motion for judgment of acquittal made at the conclusion of the State's evidence, for the prosecution failed to prove a prima facie case since its own evidence established that the killing was justifiably in self-defense.[2] See Ala. Code (1975), §13A-3-23.
In the absence of a thorough delineation by an Alabama appellate court of the respective roles of trial court and the jury in treatment of a self-defense claim, we find the following helpful:
 "The determination . . . requires the application of the well-established rule, as stated in State v. Rash, [359 Mo. 215,] 221 S.W.2d [124,] at [124] [(1949)]:
 " '* * * Ordinarily self defense is in the nature of an affirmative defense, and a question for the jury. But whether the state's evidence, which is neither disputed nor contradicted, established self defense so as to make a killing justifiable homicide instead of murder or manslaughter is a question of law for the court.' (Emphasis added.)"
 "A further refinement of this rule is found in State v. Jackson, *Page 1285 522 S.W.2d 317 (Mo.App. 1975) and cases cited therein, where the court said, [at 319]:
 " '* * * But where the evidence is conflicting or of such a character that different inferences might reasonably be drawn therefrom, it is generally a question of fact for the jury to determine whether the accused acted in self-defense in a particular case. (cases cited) * * * Only when all the evidence is undisputed and clear should a court dispose of a murder or manslaughter charge by acquittal without tendering the issue of self-defense to the jury (cases cited). Rarely, then, is self-defense declared by law so as to bar the submission of the homicide offense altogether.' (Emphasis added.)"
State v. Thornton, 532 S.W.2d 37, 42-43 (Mo.App. 1975) (footnote omitted). Cf. Raines v. State, 455 So.2d 967, 974
(Ala.Cr.App. 1984).
On rare occasions, the Alabama courts have reversed the trial court for its failure to direct an acquittal verdict where the prosecution's evidence in presenting the evidence of the killing also presented undisputed evidence of self-defense. Seee.g., Bishop v. State, 23 Ala. App. 109, 121 So. 455 (1929);Simmons v. State, 22 Ala. App. 126, 113 So. 466 (1927). These two cases have been cited as authority for the following general principle: "If the undisputed evidence shows clearly that the accused was in actual or apparent imminent peril and was unable to retreat, and there is no evidence warranting a finding that he was at fault, he is entitled to have the jury instructed to return a verdict of not guilty." C. Gamble,McElroy's Alabama Evidence § 457.02(7) (3d ed. 1977). See alsoHamby v. State, 254 Ala. 139, 47 So.2d 218 (1950); Thompsonv. State, 376 So.2d 761, 764 (Ala.Cr.App.), rev'd on othergrounds, 376 So.2d 766 (Ala. 1979) (wherein the court noted that "[w]here the undisputed evidence clearly shows the victim to be at fault, the accused may be entitled to a directed verdict").
More particularly apropos to the instant facts is Pratt v.State, 50 Tex.Crim. R., 96 S.W. 8, 10 (1906), where the prosecution, "to a very considerable extent, relied upon the admissions or confessions of appellant" which established, not only that he killed the victim, but that he did it in self-defense. There was no eyewitness to the killing. Id. The court held that, where the criminating evidence consists almost entirely of appellant's admission that he killed the victim, the prosecution has the burden to prove the falsity of the exculpatory portion of appellant's statement. Id. (Relying onJones v. State, 29 Tex. App. 20[29 Tex.Crim. 20], 13 S.W. 990 (1890)).
Another court stated the general principles applicable to the prosecution's use of the defendant's statement, which confirmed the defendant's commission of the killing as well as justification by self-defense, as follows:
 "The prosecution, having presented as a part of its case the statement of defendant as to how the killing occurred, is bound by that evidence in the absence of proof to the contrary. People v. Coppla, 100 Cal.App.2d 766, 769, 224 P.2d 828. If there be any well-established circumstance which may be reasonably regarded as incompatible with the theory that the killing was justifiable, the trier of fact, from a consideration of all the evidence, is warranted in finding that the act amounted to an unlawful homicide. People v. Acosta, 45 Cal.2d 538, 541, 290 P.2d 1."
People v. Collins, 189 Cal.App.2d 575, 11 Cal.Rptr. 504, 515
(Dist.Ct.App. 1961). That court reversed the appellant's voluntary manslaughter conviction upon its finding that the appellant's statement or the other evidence offered nothing which "may be reasonably regarded as incompatible with the theory that the killing was justifiable." Id.
Thus, from the fact that the prosecution's use of Lockett's admissions presented exculpatory as well as inculpatory evidence does not follow the mandate that Lockett was entitled to a judgment of acquittal.
 "Where the defendant's statements to witnesses for the state as to what took place between the deceased and himself are shown, the jury need not consider *Page 1286 
them to the exclusion of all other facts and circumstances bearing on the question of self-defense. The state is not precluded by a confession of the defendant that he killed the deceased in self-defense. . . ."
3 Warren on Homicide § 285, p. 330 (1938) (footnote omitted). We must look to the remainder of the prosecution's evidence to determine whether any contradiction of Lockett's admissions existed or any evidence was presented which generated reasonably different inferences.
In applying the enunciated principles, we hold that this case is not the rare and unusual situation where the proof uncontradictedly and clearly established that Lockett was forced to kill to defend himself or others. Compare Kent v.State, 367 So.2d 508 (Ala.Cr.App. 1978), cert. denied,367 So.2d 518 (Ala. 1979). The evidence presented, in particular, one circumstance which is "of such a character that different inferences might reasonably be drawn therefrom": one of the victim's wounds admittedly inflicted by Lockett was to the victim's back. We are bound by the following:
 "The evidence without dispute showed that there were three wounds upon the body, and that the death wound was in the back of the deceased. Appellant's contention that he was entitled to the general affirmative charge cannot be sustained. The mere fact of the death wound being in the back of the deceased, without reference to the oral testimony of witnesses, would necessitate a submission of the case to the jury, for the weight and probative force of evidence is for the jury, and the physical evidence as to location of the death wound rendered the affirmative charge inapt, and under such state of facts the court was without authority to direct a verdict."
Riddle v. State, 25 Ala. App. 142, 143, 142 So. 680, 681, cert.denied, 225 Ala. 218, 142 So. 682 (1932) (citations omitted).See also Hopkins v. State, 429 So.2d 1146, 1159 (Ala.Cr.App. 1983) (wherein the court noted that "the fact that both victims were shot in the back and at close range negates appellant's contentions that he acted in self-defense or fired blindly from a distance of twenty feet"); Mack v. State, 348 So.2d 524, 527
(Ala.Cr.App. 1977) (wherein the court held that appellant's claim of self-defense, when considered with the evidence that the deceased had two gunshot wounds in the back, one on the side of the left shoulder, and one in the front of the right shoulder, presented a jury question); Jones v. Commonwealth,311 S.W.2d 190, 193 (Ky. 1958); 3 Warren on Homicide § 285, p. 327-28 (wherein it was stated, "A preponderance of evidence supporting defendant's claim that he shot in self-defense may be sufficiently overcome by undisputed evidence that deceased was shot in the back").
Thus, we cannot hold that, as a matter of law, Lockett's killing of Jude was justifiable homicide and nothing else; the issue of self-defense was a question properly submitted to the jury. Thus, we find that the trial court did not err in denying Lockett's motion. We need not determine if the probative force and weight of the prosecution's evidence indicated beyond a reasonable doubt and to a moral certainty that Jude's killing was unjustified, for we reverse and remand for a new trial on the error discussed below.
 II
During the prosecution's closing arguments, the following occurred:
 "MR. GRIFFIN [defense counsel]: We object to that statement, the defendant can tell you what happened. That amounts to a comment, we think, that's impermissible and ask for a mistrial on that statement.
 "THE COURT: I sustain the objection and instruct the jury — you want me to instruct the jury?
"MR. GRIFFIN: Yes, sir.
 "THE COURT: That the defendant is under no obligation to present any evidence or present any testimony or to testify in the case himself. And you are not to consider the statement by Mr. Webster, disregard it, do not consider it in any way. And otherwise overruled." *Page 1287 
Lockett contends that the prosecutor's comment was a comment on his failure to testify and that since the trial court's instructions did not comply with the directives of Whitt v.State, 370 So.2d 736 (Ala. 1979), the trial court should have granted his motion for mistrial.
We find our supreme court's recent opinion in Ward v. State,497 So.2d 575 (Ala. 1986), to embody all the necessary controlling principles to dispose of this issue. There, the court turned to its opinion in Beecher v. State, 294 Ala. 674,320 So.2d 727 (1975), for the test for reviewing improper prosecutorial comment on the defendant's failure to testify and the remedy for such, which is as follows:
 "[[W]here] there exists the possibility that the prosecutor has commented in such a manner that the jury may understand it as a comment on the defendant's failure to testify, it is for the trial court to cure this violation of prosecutorial duty by prompt and vigorous instructions to the jury informing them of defendant's right not to be compelled to testify and that they may draw no presumption from his decision not to testify."
Ward, 497 So.2d at 576 (quoting Beecher, 294 Ala. at 683,320 So.2d at 735) (emphasis in Beecher; footnote from Beecher
omitted). Then, the Ward court reiterated the principles enunciated in Whitt, as follows, to hold that the trial court failed to cure any error resulting from the prosecutorial remarks made during closing argument:
 "In Ex parte Whitt, 370 So.2d 736 (Ala. 1979), this Court established a standard to be applied in testing the 'cure' in 'direct comment' cases:
 " 'We suggest that, at a minimum, the trial judge must sustain the objection, and should then promptly and vigorously give appropriate instructions to the jury. Such instructions should include [instructions] that such remarks are improper and to disregard them; that statements of counsel are not evidence; that under the law the defendant has the privilege to testify in his own behalf or not; that he cannot be compelled to testify against himself; and, that no presumption of guilt or inference of any kind should be drawn from his failure to testify. With appropriate instructions, we hold that the error of the prosecutor's remarks will be sufficiently vitiated so that such error is harmless beyond a reasonable doubt.' 370 So.2d at 739."
Ward, 497 So.2d at 576.
In applying these principles, we find that this cause is to be reversed, for the trial court's instructions to the jury did not follow the minimum instruction set forth in Whitt and, thus, failed to cure the prejudice created by the improper prosecutorial comment. See also Tucker v. State, 454 So.2d 552,553 (Ala. 1984) (wherein the court condemned comments containing a statement virtually identical to the one at bar and found those comments "to be so prejudicial as to be ineradicable"); Blackmon v. State, 462 So.2d 1057 (Ala.Cr.App. 1985).
Our reversal on this sole issue should not be construed as an implied finding that the other issues raised by Lockett on appeal are without merit.
The judgment of the circuit court is reversed and the cause remanded.
REVERSED AND REMANDED.
All Judges concur.
[1] As a result of these discoveries, Lockett was prosecuted and convicted for possession of marijuana and cocaine. See Lockettv. State, 489 So.2d 653 (Ala.Cr.App.), cert. denied, ___ U.S. ___, 107 S.Ct. 177, 93 L.Ed.2d 113 (1986).
[2] In addressing this issue, we have considered only the evidence which was before the trial court at the time Lockett's motion was made. Kent v. State, 367 So.2d 508, 515 (Ala.Cr.App. 1978),cert. denied, 367 So.2d 518 (Ala. 1979).