623 P.2d 574

**Margherita M. HENNING and Vernon O. Henning, Plaintiffs-Appellants,**

v.

**Livingston PARSONS, Jr., Defendant-Appellee.**

**No. 4461.**

Court of Appeals of New Mexico.

Sept. 11, 1980.

Certiorari Quashed Jan. 18, 1981.

Richard E. Ransom, P. A., Smith, Ransom & Gilstrap, Albuquerque, for plaintiffs-appellants.

W. Robert Lasater, Jr., Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, for defendant-appellee.

## OPINION

WALTERS, Judge.

The trial court granted a summary judgment to the defendant doctor on plaintiffs' claim of medical malpractice. After the appeal was filed, Mrs. Henning died of breast cancer. Her husband continues as appellant in this court, and asserts that summary judgment was improper because material issues of fact exist regarding four alleged acts of negligence:

(1) Dr. Parsons failed to use care and skill in his examination and evaluation of the breast lump referred to him for diagnosis;

(2) he withheld and misrepresented the reasonable and recognized risk of malignancy to be expected from the lump in Mrs. Henning's breast;

(3) he failed to inform Mrs. Henning of that which a reasonably prudent person would need to know in order to decide whether to undergo a biopsy;

(4) he failed to proceed in a timely manner to biopsy the breast lump.

The judgment contains the trial court's finding "that there is no genuine issue of material fact, and that there is no evidence that the defendant Livingston Parsons, Jr. deviated from the standards of medical practice required in this and similar communities* * * *" Giving to plaintiff the benefit of all reasonable doubts in determining whether a genuine issue exists, *Pharmaseal Laboratories, Inc., v. Goffe*, 90 N.M. 753, 568 P.2d 589 (1977), we agree and affirm the trial court.

The affidavit of Dr. P. G. Cornish III, a recognized Albuquerque physician specializing in general surgery, was submitted in support of defendant's motion for summary judgment. In it Dr. Cornish stated that, based upon his review of the complaint, the depositions taken of Dr. Parsons and Mrs. Henning, Dr. Parsons's office records, and the hospital records, Dr. Parsons did, in his professional opinion, "possess and apply the knowledge and use the skill and care which would be used by reasonably well qualified surgeons practicing in Albuquerque, New Mexico and similar communities in 1978" in his care and treatment of Mrs. Henning. It was Dr. Cornish's opinion that Dr. Parsons "was not in any way negligent in any aspect of his treatment." Dr. Cornish set out in his affidavit the facts he considered in reaching his opinion:

A. Mrs. Henning presented to Dr. Parsons on March 28, 1978, with a history of discovering a lump in her left breast three weeks before. Following the discovery of the lump, she had been given a mammogram which was essentially negative, showing no dominant mass in either breast. This mammogram was compared with a mammogram taken in August of

1976 and there had been no perceptible change in the left breast.

B. Dr. Parsons described the lump as a vague area of thickening with no actual mass. He found no adenopathy. Mrs. Henning described the lump from her own examination as being ever so slightly tender and involving an area about ¾-inch from left to right and ⅜-inch in height. Mrs. Henning made other comments about the lump in her breast in her deposition which affiant does not find medically significant. Assuming Mrs. Henning's description of the lump was correct, affiant believes a reasonable and acceptable medical course of action would be to watch the area and reexamine it within a month or so or earlier if there were any significant changes.

C. Dr. Parsons next saw Mrs. Henning on May 8, 1978. On that date Mrs. Henning was examined again by Dr. Parsons. According to Mrs. Henning, there had been no change in the lump since her last examination. According to Dr. Parsons, the lump seemed to be a little more distinct than in his previous examination. Despite the negative mammography, he decided a biopsy would be appropriate.

D. A biopsy was performed at Anna Kaseman Hospital on May 26, 1978. Mrs. Henning remembers no change in her breast at the time she was admitted to the hospital. Dr. Parsons recorded among other things that there was faint erythema of the skin with edematous skin and very firm hard breast tissue which did not have distinctive margins. Dr. Parsons noted an area of pig-skin edema below the areola of the left breast.

E. Mrs. Henning was seen again in Dr. Parsons's office and on June 13, 1978, a skin biopsy was taken from the area of edema.

F. A careful study of the tissue removed during the biopsy revealed a single small focus of small malignant cells within the dermis appearing to be within a lymphatic. Based upon the findings, affiant believes that a reasonable diagnosis of Mrs. Henning's condition would be inflammatory carcinoma of the breast.

G. Dr. Parsons did not treat the malignant breast condition but immediately referred Mrs. Henning to Dr. Paul Duncan and Dr. Simmons for treatment.

Dr. Cornish then made specific conclusions, which may be summarized as follows:

(1) Despite lack of agreement in the medical community regarding how quickly after discovery of a lump a biopsy should be performed, and whether the doctor's or the patient's description of the lump was correct, the delay in biopsying was not unreasonable.

(2) The delay did not cause any physical injury.

(3) The diagnosis after biopsy was reasonable, acceptable, and probably correct.

(4) Based on the deposition testimony of Mrs. Henning and Dr. Parsons, there was no misrepresentation of the risk of malignancy, and no failure by Dr. Parsons to discuss with Mrs. Henning her medical condition.

In the affidavit's summary, Dr. Cornish stated that "in Dr. Parsons's care and treatment of Margherita Henning, he did, in all respects follow the accepted standards of care for surgeons practicing under similar circumstances in Albuquerque, New Mexico or similar communities, in 1978."

■ It was plaintiffs' burden to demonstrate that Dr. Parsons failed to meet the standard of knowledge, skill and care owed by a physician to his patient as would ordinarily be used by reasonably well-qualified doctors of the same field of medicine practicing under similar circumstances. *Pharmeseal Laboratories, Inc. v. Goffe, supra.* Appellant relies strongly on certain questions, and answers given by Dr. Parsons at his deposition, to show that Dr. Parsons deviated from the required standards of practice. We set out below the examination of Dr. Parsons on that issue—with but minor deletions of the objections by Dr. Parsons's counsel and rephrasings by Mrs. Henning's attorney—which includes those

answers given by Dr. Parsons to which appellant points as constituting expert medical evidence of Dr. Parsons's departure from the accepted standard:

Q. Speaking hypothetically, if a reasonably well-qualified surgeon has a patient referred to him for examination and he finds an actual mass with well-defined dimensions, one and a half centimeters by one centimeter, with the history of no change for a period of three weeks or slightly more, would it then be proper for the surgeon to delay biopsy?

\* \* \* \* \* \*

As I understand it, you never found any actual mass with well-defined dimensions such as one and a half by three-quarter centimeters. Your history was not of such an actual mass, with no change for a period of three weeks? I mean, I've read your chart and I know what your history was, so what I'm asking you, Doctor, is, if we speak only hypothetically and forget about Margherita Henning for the moment, I want to know whether you believe a reasonably well-qualified surgeon who does have a patient referred to him for examination and there is a definite mass, an actual mass, and it's well-defined with the egg-shaped configuration, the dimensions of one and a half centimeters by one centimeter, it's superficial and palpable and there has been no change for a period of at least three weeks, do you know if the surgeon would properly delay a biopsy for diagnostic purposes?

[Counsel]: I'm going to further object to the question because I think it leaves out certain essential features, including the clinical judgment, the age of the patient and other indefinite factors.

I think an answer to that question would be vague, unless this was fully described.

Q. You can go ahead and answer the question.

A. I have to agree with all he said. Each case had to be evaluated separately, with all the pertinent factors being considered. I can only answer it in a generality, that I would be more inclined, with the general information that's been given, to feel that a well-trained general surgeon would consider a biopsy. It might not be his only choice or his only avenue of approach at that time, though.

Q. If a patient comes in to you, referred by a general practitioner, because he has found a mass that he wants you to take a look at, and the patient comes in and states that this mass had been present with no appreciable change for at least three weeks and has been slightly tender; that there has been slightly more fullness in the breast and that, on physical examination, you do in fact find a definite, well-defined mass and it's actually there, it has this egg-shaped configuration with the dimensions of one and a half centimeters by a three-quarters centimeter, would you believe that it would be proper at that time to delay biopsy for diagnostic purposes?

\* \* \* \* \* \*

A. I think that would be something you would consider. I would not solely consider that as the only means of treatment to be embarked on at that time. You might consider aspirating the lesion, to see if it contained fluid. You might consider repeating the mammography. You might consider another opinion. It's highly possible that you might—particularly with the situation that you described—the biopsy could be easily be done in a superficial lesion and you could proceed to biopsy. I can't see where this has any application to what we're talking about.

Q. Yes, I know I'm talking hypothetically now and I know it must be difficult for you to think about a patient coming in to your office under the circumstances that I posit.

The question pertains to when it is proper to delay biopsy for a month, as opposed to proceeding forthwith with any biopsy or other definitive diagnostic means, to rule out malignancy under the following circumstances: The family physician, a general practitioner, has been following the patient's complaint of a mass in the left breast at 6:00, below the

areola, some two fingers. This mass has not changed in size or configuration to any appreciable degree over the three-week period. This mass or lump may be described as a definite and actual mass with well-defined dimensions, one and a half by one centimeter. It is firm and not in deep tissue; that is, somewhat superficial. It is indurated and hard. The patient has had a mammogram within the three-week period.

A. Between examinations are we talking about?

Q. Between the time that the family physician is first seen and the patient comes to the surgeon on referral for evaluation.

And the mammogram is, in all respects, the same as the one that Margherita Henning brought to you on the day that she visited you, March 28, 1978.

Do you believe, under those facts, if those had been the facts, that it would be proper to delay biopsy?

A. I would like to say that I object to the question, too. I think it's a loaded question and, however I answer it, it's designed to put me in a bad light, when you use such terms as "delay" in posing the question.

I would also like to state that I think this hypothetical situation, which is rather involved and hard for me to follow, that you have set up, has no similarity whatsoever to Dr. Henning's case and that fortunately, I would never have to make a decision on a patient with just this kind of information available.

* * * * * *

Q. Let me suggest, then, that Dr. Parsons preface his answer with any preparatory remarks that he thinks are proper and then have the question read back and let him answer it, while the reading back is fresh on his mind.

A. I also think that, when I'm referred a patient by a family practitioner, of course I'm going to lend weight to his observations or findings; but that any physician who was worth his salt is going to do his own examination, make his own evalua-tion and decide on that basis rather than just rubber-stamping the impressions or recommendations of a referring doctor, if he doesn't feel those are in the patient's best interests.

Q. Doctor, in this question, it was my intention that you assume that the mass was found by you on physical examination to be as I have described. You understood that; did you not?

A. Yes.

Q. Would you read the question back then?

* * * * Then, Doctor, if you feel you can answer that, please do so.

A. I think that under the set of limited facts given to me, that I would feel that it would be proper to proceed with a biopsy. But I would again say that that might not be a decision that would invariably be made by all surgeons dealing with this problem and receiving that set of facts.

Q. Receiving that set of facts?

A. Hypothetical facts.

Q. If you were personally presented with those hypothetical facts, though, as I understand your answer, you would deem it proper to proceed with biopsy?

A. Yes. It's not a real-life situation, but in my thinking, I would find it hard not to proceed with a biopsy.

Q. What did you tell Margherita Henning on March 28th, were your findings?

A. I told her that there was not a definite mass or growth in her breast and that she had no confirmatory signs to suggest a malignant tumor. We reviewed everything; physical examination, history. I answered her many questions and I told her that my evaluation was that I thought the problem probably benign, that it probably was not a neoplasm or a new growth of tissue and that I felt the best course would be to follow her and reexamine her in a month's time or sooner, if she noticed any changes that were progressive or that concerned her. She was informed that no positive diagnosis can be made, other than with the microscope.

As appears from the above testimony, Dr. Parsons and Mrs. Henning disagreed on the appearance of the mass when she first was seen by Dr. Parsons on March 28, 1978. She referred to it in her deposition as a lump, and described what she found of March 6th as "a hard area about three-fourths in ch from left to right and three-eights of an inch in height * * * shaped like an almond or an egg and it was smooth."

■ Appellant urges us to hold that certain of Dr. Parsons's quoted testimony established the medical standard and created a genuine issue of fact warranting a trial on the merits. We do not have the liberty to so read that testimony because it would require us, in order to agree that it creates a factual issue regarding the standard in the medical community, to select some of Dr. Parsons's testimony apart from the whole of those questions and answers and, at the same time, to disregard the contents of Dr. Cornish's affidavit. Together, the entirety of Dr. Parsons's testimony and the affidavit dispel the existence of such a factual issue.

*Gerety v. Demers*, 92 N.M. 396, 411, 589 P.2d 180, 195 (1978), repeated the rule of *Pharmaseal Laboratories, Inc. v. Goffe, supra*, regarding the need for expert testimony in malpractice cases. In rephrasing the rule again, the Supreme Court affirmed the necessity for expert medical evidence to establish (1) the standard of care, treatment, and information by which the actions of the physician are to be judged; (2) the manner in which he measures up to the standard, and (3) whether his alleged acts were the proximate cause of the injuries complained of.

When Dr. Parsons's testimony and Dr. Cornish's affidavit are taken together, the fair analysis shows that Dr. Cornish did not articulate an exact standard of care, but he did unequivocally state that even though all doctors in the community would not agree on the rapidity with which a biopsy should be performed, Dr. Parsons *did follow* the accepted standard of practice. If Dr. Parsons did so, and even though there was no precise expression of what the time limit of

that standard is, the only sound interpretation of the full content of Dr. Cornish's affidavit is that Dr. Parsons's conduct not only illustrated the standard, but it is the standard.

Dr. Parsons's testimony, then, establishes only that if the facts of Mrs. Henning's appearance were as testified by her, he would have applied a higher personal standard and would probably have proceeded with a biopsy. Parts of his testimony cannot be excised, however, to delete his own qualifications of it: that his decision to proceed with a biopsy if the facts were as stated by Mrs. Henning "might not be a decision that would invariably be made by all surgeons dealing with this problem and receiving that set of facts." Thus, even assuming Mrs. Henning's description to be true, Dr. Parsons's testimony was that his decision under those facts would not create nor necessarily be the same as the standard in the community; it would reflect a higher standard.

We can agree that the configuration of the lump was in dispute. But that is not a material issue of fact when, even accepting Mrs. Henning's description, as Dr. Cornish did, he asserted as an expert witness that Dr. Parsons "in all respect [did] follow the accepted standards of care." Dr. Parsons's testimony in no way refuted or clashed with the expert evidence regarding the accepted medical standard in the community.

The statements of Dr. Cornish's affidavit and the evidence contained in the depositions likewise met the requirements of *Gerety, supra*, on the issue of disclosure of, as plaintiff asserts, "the risk of malignancy to be expected from the lump [or] * * * * what a reasonably prudent person would need to know in order to decide whether to undergo a diagnostic biopsy." *Gerety v. Demers, supra*, the most definitive statement of the law of malpractice in New Mexico, sets up a two-step foundation for assessing the extent of the doctor's duty to divulge. It recognizes that, ordinarily, expert testimony is "indispensable" to establish and make clear to the fact-finder what risks of treatment are entailed, whether

alternative treatments are available, and what results should be anticipated if treatment is not rendered. Upon that medical testimony regarding disclosure, however, the determination of its observance or breach is not to be determined by the practice in the medical profession to disclose or withhold certain information, but by "a standard set by law for physicians" based upon "conduct which is reasonable under the circumstances." *Id.*, 92 N.M. at 409, 589 P.2d at 193.

■ This was the rule developed in *Canterbury v. Spence*, 464 F.2d 772 (D.C.1972), approved and adopted in *Gerety.* Thus the New Mexico rule on disclosure is one of law, not resting solely in medical expertise, but requiring a doctor to disclose what reasonable men who possessed their medical talents probably would. However, just as *Canterbury* observed (the language of which case was adopted by our Supreme Court in *Gerety*), there is "no obligation to communicate those [inherent and potential hazards of the proposed treatment, the alternatives to that treatment, if any, and the results likely if the patient remains untreated] of which persons of average sophistication are aware. Even more clearly, the physician bears no responsibility for discussion of hazards the plaintiff has already discovered* * * *" 92 N.M. at 410, 589 P.2d at 194.

Mrs. Henning's sophistication in the subject matter of breast cancer was much above average. Her deposition discloses that she had been a nurse and had finished two years of medical school; that she had completed "a tremendous amount" of breast cancer research in 1977 for the National Cancer Institute and learned, among other things of the "need for * * * immediate biopsies." Under the undisputed facts of this case, however, it is apparent that the trial court disregarded her unique degree of medical information on the subject, and applied the objective, "reasonable-under-the-circumstances" legal standard called for in *Gerety*, 92 N.M. at 409, 589 P.2d at 193, regarding disclosure by Dr. Parsons. There is no room to speculate that, when the accepted standard in the medical profession would not lead to a decision to perform an immediate biopsy, "a reasonably prudent" lay person in plaintiff's position, with or without her special knowledge, would make a different decision. *Id.* at 92 N.M. 410, 585 P.2d 194.

A material issue of fact is not raised by the pleadings, depositions, or affidavit, concerning misrepresentation or non-disclosure of hazard, alternative diagnosis procedures, or likely results of an undiagnosed or untreated condition; nor that Dr. Parsons breached the objective standard of disclosure discussed in *Canterbury, supra*, and adopted in *Gerety* as the New Mexico rule. The medical evidence is to the contrary; the legal standard of measuring the doctor's duty to disclose according to what "is reasonable under the circumstances" was observed and the motion was correctly decided.

The summary judgment entered by the trial court is affirmed.

ANDREWS, J., concurs.

SUTIN, J., dissents.

SUTIN, Judge (dissenting).

I dissent.

The Hennings appealed from a summary judgment granted Dr. Livingston Parsons, Jr., arising out of a claim of medical malpractice. Pending the appeal, Mrs. Henning died of cancer of the breast. We should reverse.

This is a second case in which summary judgment was heard and granted the morning of trial before selection of the jury. See, *Goffe v. Pharmaseal Laboratories, Inc.*, 90 N.M. 764, 568 P.2d 600 (Ct.App.1976), Sutin, J., dissenting, reversed 90 N.M. 753, 568 P.2d 589 (1977). I shall not repeat the admonition that a summary judgment of this nature granted the morning of trial does not hasten the administration of justice.

The complaint alleged four acts of negligence. Dr. Parsons (1) failed to use care and skill in his examination and evaluation of the breast lump referred to him for

diagnosis; (2) withheld and misrepresented the reasonable and recognized risk of malignancy to be expected from the lump in Mrs. Henning's breast; (3) failed to inform Mrs. Henning of that which a reasonably prudent person would need to know in order to decide whether to undergo a biopsy; and (4) failed to proceed in a timely manner to biopsy the breast lump.

The trial court found "that there is no genuine issue of material fact, and that there is no evidence that the defendant Livingston Parsons, Jr. deviated from the standards of medical practice required in this and similar communities * * * * "

In *Goodman v. Brock*, 83 N.M. 789, 498 P.2d 676 (1972), the Supreme Court ruled out the use of phrases such as "slight doubt" or the "slightest doubt" in determining the existence of a genuine issue of material fact. The Court held that the party opposing a motion for summary judgment shall be given the benefit of all "reasonable doubts." The "reasonable doubt" rule continued unabated until 1979. In *Fischer v. Mascarenas*, 93 N.M. 199, 598 P.2d 1159 (1979), the trial court dismissed defendant's counterclaim on plaintiff's motion for summary judgment. In reversing, the Supreme Court said:

> * * * The remedy should not be employed where there is the *slightest doubt* as to the existence of an issue of material fact. *Spears v. Canon de Carnue Land Grant*, 80 N.M. 766, 461 P.2d 415 (1969). [Emphasis added.] [Id., 93 N.M. 199, 598 P.2d at 1161.]

*Fischer* did not expressly overrule *Goodman v. Brock*. Neither was it overruled sub-silentio. It is apparent that the cited language in *Fischer* was inadvertent.

Under *Goodman v. Brock*, the burden was on defendants to show an absence of a genuine issue of material fact. Once defendants made a prima facie showing that they were entitled to summary judgment, the burden shifted to plaintiff to show that there was a genuine issue of fact and that defendants were not entitled to summary judgment as a matter of law.

On review, this Court must view the facts and inferences arising therefrom in the light most favorable to the party against whom the motion was granted. *Evans v. Bernhard*, 23 Ariz.App. 413, 533 P.2d 721 (1975).

To make a prima facie showing of summary judgment, Dr. Parsons presented the affidavit of Dr. P. G. Cornish III, a qualified and licensed physician who specialized in surgery. He was familiar with the recognized knowledge, skill and care used by reasonably well-qualified surgeons engaged in performing breast examinations and performing biopsies in Albuquerque or similar communities. It was his professional opinion that Dr. Parsons, in his care and treatment of Mrs. Henning, did possess and apply the knowledge and use the care and skill which would be used by reasonably well-qualified surgeons practicing in Albuquerque and similar communities in 1978; that Dr. Parsons was not in any way negligent in any aspect of his treatment of Mrs. Henning. His opinion was based upon a host of facts and conclusions set forth in narrative form. To summarize the facts:

On March 28, 1978, Dr. Parsons first examined Mrs. Henning with reference to a lump in her left breast, and again on May 8, 1978. Dr. Cornish believed that a reasonable and acceptable medical course of action would be to watch the breast area and reexamine it within a month or so or earlier if there were any significant changes.

On May 8, 1978, according to Mrs. Henning, there had been no change, but Dr. Parsons thought the lump seemed to be a little more distinct. He noted a faint inflammation of the skin and an area of pig skin edema below the nipple of the left breast. Despite the negative mammography, he decided a biopsy would be appropriate.

On June 13, 1978, a skin biopsy was taken and it revealed a single small focus of small malignant cells within the lower portion of the skin. Dr. Cornish believed that a reasonable diagnosis would be inflammatory carcinoma of the breast. Dr. Parsons did not treat the malignant breast.

Dr. Cornish's first conclusion was:

A. *There is a variation in the medical community with respect to the rapidity with which a biopsy should be performed following the discovery of a lump.* However, assuming Mrs. Henning's description of the lump is correct, *affiant does not believe that there was an unreasonable delay before the breast was biopsied.* Assuming Dr. Parsons' description of the lump is correct, affiant reaches the same conclusion.

Dr. Cornish stated that Dr. Parsons complied with the standard of knowledge, skill and care owed by a physician to a patient, the standard ordinarily used by reasonably well-qualified doctors in the same field of medicine. *Pharmaseal Laboratories, Inc. v. Goffe*, 90 N.M. 753, 568 P.2d 589 (1977).

Dr. Cornish could not apply the standard as a matter of law "with respect to the rapidity with which a biopsy should be performed following the discovery of a lump." None could be stated because the matter of rapidity varied in the opinion of surgeons.

The delay in the instant case was 28 days. Dr. Cornish established a time period standard of "No unreasonable delay." This standard is a factual issue per se. What time period is or is not "unreasonable" is a variable. It changes from surgeon to surgeon. This time factor is unknown. The reason for this unknown factor flows from the fact that a variety of opinions of surgeons would differ from an immediate biopsy forward in time sequence to 28 days. This is the equivalent of saying that other surgeons would testify that Dr. Parsons' delay was unreasonable. Given an opportunity to cross-examine Dr. Cornish, a disclosure of such surgeons would probably appear. At oral argument on the motion for summary judgment the morning of trial, Hennings' lawyer stated that he had interviewed a highly respected general surgeon; that "I have not been able to persuade this doctor to testify, because he is satisfied I have got it in the record, and he does not want to become personally involved with a legal matter in court, face to face with Dr. Parsons." This conduct has been dubbed a "conspiracy of silence."

This "conspiracy of silence" was explicitly set forth in *Goffe, supra* (Sutin J., dissenting). Such a conspiracy should not be fostered as a means of obtaining summary judgment. Where a variation of medical opinion exists with respect to rapidity with which a biopsy should be performed, common sense writes a rule that the patient need not secure a surgeon to dispute the testimony of defendant's surgeon to create an issue of fact. The admission of a variation of opinion in the medical community is sufficient to establish its existence. It is equivalent to testimony that Doctors Joe Doe and John Roe who are well-qualified surgeons will disagree. It naturally follows that one of these surgeons will testify that Dr. Parsons exercised "unreasonable delay" in performing the biopsy, thus creating a genuine issue of material fact.

Dr. Parsons' testimony affirms this conclusion. Hypothetical questions were asked with reference to whether it was proper to delay the biopsy for a month as opposed to proceeding immediately, malignancy being ruled out. The questions and answers are as follows:

Q.  \* \* \*  The family physician \* \* \* has been following the patient's complaint of a mass in the left breast\* \* \* \* This mass has not changed in size or configuration to any appreciable degree over the three-week period. This mass or lump may be described as a definite and actual mass with well-defined dimensions\* \* \* \* The patient has had a mammogram within the three-week period \* \* \* \*

\*  \*  \*  \*  \*  \*

\* \* \* the same as the one \* \* \* brought to you on \* \* \* March 28, 1978.
Do you believe, under those facts, if those had been the facts, that it would be proper to delay biopsy?

\*  \*  \*  \*  \*  \*

A. *I think that under that set of limited facts given to me, that I would feel that it would be proper to proceed with a biopsy. But I would again*

*say that that might not be a decision that would invariably be made by all surgeons dealing with this problem and receiving that set of facts.*

Q. *If you were personally presented with those hypothetical facts * * * you would deem it proper to proceed with biopsy?*

A. *Yes.* It's not a real-life situation, but in my thinking, I would find it hard not to proceed with a biopsy. [Emphasis added.]

The negligence of a doctor can be established by his own testimony. *Mascarenas v. Gonzales*, 83 N.M. 749, 497 P.2d 751 (Ct. App.1972). If the facts stated in the hypothetical question are proven, Dr. Parsons admits that the biopsy should have taken place on March 28, 1978, the date of the first examination, even though a variable exists among "all surgeons dealing with this problem."

I do not declare that Dr. Parsons is negligent in this respect. What I do say is that a genuine issue of material fact exists.

The Hennings established by medical testimony that on March 7, 1978, 21 days before her examination by Dr. Parsons, Mrs. Henning had a well-defined actual mass in her left breast with well-defined dimensions. A mass is something solid, not filled with air like a bowel or not filled with fluid like a cyst, something that should not be there. It was constantly referred to as a lump. On March 18, this mass persisted with no appreciable change in configuration or size. These facts were confirmed by Mrs. Henning and her daughter. The hypothetical question was based on facts supported by competent evidence and proved. This method of examination of an expert witness is a well-established rule of evidence, 32 C.J.S. Evidence § 551(1) (1964), but never defined in New Mexico. It has simply been accepted as a matter of course during trial. It was not challenged in this appeal.

In his office chart, at the time of his first examination of Mrs. Henning, Dr. Parsons wrote "Vague area of thickening. No actual mass." He testified, "there was no tumor." Nevertheless, on April 1, 4 days later, Dr. Parsons telephoned the Henning family physician, who had previously examined Mrs. Henning and had recommended Dr. Parsons, to state that he did not believe the mass to be malignant. Mrs. Henning asked Dr. Parsons for a biopsy and he said it wasn't necessary because the lump was benign and not malignant. In her mind the lump was not malignant, until Dr. Parsons called a month later, after the biopsy, to give her the bad news.

Dr. Parsons failed to show an absence of a genuine issue of material fact in two respects: (1) whether Dr. Parsons failed to use care and skill in his examination and evaluation of the breast lump referred to him for diagnosis and (2) whether he failed to proceed in a timely manner to biopsy the breast lump.

By way of testimony presented by the Hennings, a genuine issue of material fact also exists: (1) whether Dr. Parsons failed to inform Mrs. Henning of that which a reasonably prudent person would need to know in order to decide whether to undergo a biopsy. Dr. Parsons only said it was not necessary; and (2) whether Dr. Parsons withheld or misrepresented the reasonable and recognized *risk* of malignancy to be expected from the lump in Mrs. Henning's breast. Dr. Parsons did not suggest the *risk* of cancer, a matter of grave concern to women generally in recent years.

The Hennings did contend in this appeal that Dr. Parsons' answers to the hypothetical questions established a deviation from the required standards of medical practice. Dr. Parsons' countered with *Montana Deaconess Hospital v. Gratton*, 169 Mont. 185, 545 P.2d 670, 673 (1976) in which the court said:

[T]he personal and individual method of practice of the defendant doctor is not sufficient to establish *a basis for an inference* that he has negligently departed from the general medical custom and practice of his community. [Emphasis added.]

**464**

This rule was taken from *Evans v. Bernhard, supra.* See also, *Downer v. Veilleux*, 322 A.2d 82 (Me.1974); *Karrigan v. Nazareth Convent & Academy, Inc.*, 212 Kan. 44, 510 P.2d 190 (1973). An "inference" is a logical deduction from facts proved, *Bolt v. Davis*, 70 N.M. 449, 374 P.2d 648 (1962); and an "inference" and "presumption" are used interchangeably, *Tuso v. Markey*, 61 N.M. 77, 294 P.2d 1102 (1956).

The "personal method of practice" rule means that we cannot presume from the individual practice of a doctor that he negligently departed from the standard. In other words, Dr. Parsons' method of practice may not be "a basis for an inference" of negligent departure, but when he admits that a contrariety of medical opinion exists on his method of practice, an inference can be drawn that he departed from the standard of the medical community.

Dr. Parsons' answers to hypothetical questions did express his personal, usual practice with reference to the delay taken in performing the biopsy. Dr. Parsons testified that his individual practice would be to perform a biopsy immediately. I agree that this practice does not violate the standard. The fact, however, that he waited 28 days, is sufficient to establish "a basis for an inference" that he did negligently depart from the standard. We may presume that he negligently violated the standard. Dr. Parsons' answers to the hypothetical questions did not directly establish a deviation as the Hennings argue, but where a presumption of a deviation exists, I do not hesitate to say that it creates a genuine issue of material fact.

It is well established that the standard of knowledge, skill and care can be proven by a defendant doctor's own testimony. *Evans, supra; Montana Deaconess Hospital, supra.* I note, however, that Dr. Parsons' testimony did not differ from that of Dr. Cornish; that a variation of opinion exists in the medical community.

I also note in passing that Dr. Cornish believed delay did not appreciably affect the prospects for survival, and that Dr. Parsons' care did not cause or contribute to Mrs. Henning's condition. I interpret these opinions to mean that if the biopsy had been performed on March 28, 1978, following Dr. Parsons' first examination, the discovery of cancer cells on that date, a month earlier, would not have caused, contributed to, or prevented her death. This issue was not raised in this appeal. It is important to comment that the Hennings' complaint does not seek damages for the death of Mrs. Henning. The Hennings are entitled to damages only for such alleged injuries or loss sustained that occurred between March 28, 1978 to June 13, 1978, when Mrs. Henning was notified that a malignancy existed. I do not indicate in the slightest that Dr. Parsons is liable for medical malpractice. I only hold that a genuine issue of material fact exists.